**FIRST FEDERAL SAVINGS & LOAN ASSOCIATION OF WARNER ROBBINS**

v.

**STANDARD BUILDING ASSOCIATES, LTD.**

Civ. No. 1:87–CV–2725–ODE.

United States District Court,
N.D. Georgia,
Atlanta Division.

June 16, 1988.

See also, 85 B.R. 644.

James R. Sacca, Macey, Wilensky, Cohen, Wittner & Kessler, Atlanta, Ga., for plaintiff.

James L. Paul, Russell R. Grosse, Gambrell, Clarke, Anderson & Stolz, Atlanta, Ga., for defendant.

### ORDER

ORINDA D. EVANS, District Judge.

This bankruptcy action is before the court pursuant to an appeal taken by First Federal Savings & Loan Association, ("First Federal") of the bankruptcy court's order setting aside a foreclosure of the Standard Building Limited Partnership's main asset, a piece of commercial real estate known as the Standard Building.

The bankruptcy court's findings of fact can be briefly summarized as follows. Appellant, First Federal, held a $2,000,000 mortgage on the Standard Building. The Standard Building Associates Ltd. (hereinafter "Debtor") was behind in its mortgage payments. Counsel for the Debtor attempted to work out an agreement with First Federal which would keep first the bank from foreclosing on the mortgage and keep the Debtor out of bankruptcy. The bankruptcy court found that First Federal

had agreed to hold off on foreclosure until contacted again by Debtor's former counsel regarding settlement. Counsel for First Federal then specifically avoided phone calls from Debtor's former counsel until the foreclosure was accomplished. The court found that counsel for First Federal acted in such a manner in order to induce Debtor's counsel into remaining inactive so that the foreclosure could be accomplished. The foreclosure and sale were completed at 10:13 a.m. on November 4, 1986; Debtor's Chapter 11 petition was filed less than thirty minutes later. First Federal bought the property at the nonjudicial foreclosure sale for $2,099,123.61, an amount representing the amount due on the loan plus costs incurred in carrying out the foreclosure.

Debtor moved to avoid or set aside the foreclosure as a fraudulent conveyance under § 548 of the Bankruptcy code, or, alternatively, as a preference under § 547(b). After a bench trial during which the court considered evaluations from three professional appraisers,[1] the court determined that Debtor's proffered evaluation of the fair market value ("FMV") of the Standard Building was the correct one, yielding an estimate of $3,067,000. The court then applied the rule of *Durrett v. Washington National Insurance Co.*, 621 F.2d 201 (5th Cir.1980), and determined that because Debtor received only 68% of the FMV of its asset at the foreclosure sale that the transaction should be set aside under § 548 as a fraudulent transfer.

The bankruptcy court also agreed with Debtor that the foreclosure should be set aside as a voidable preference under § 547(b) of the code, because it met the technical requirements of a voidable preference and enabled First Federal to receive more than it would have received in a Chapter 7 proceeding. Based on these two rationales the bankruptcy court ordered that the foreclosure be set aside.

On appeal First Federal makes several challenges to the bankruptcy court's deci-

sion. First, it argues that the bankruptcy court misapplied the fraudulent transfer provision of § 548. Second, it argues that the court misinterpreted the permissible scope of § 547 when setting aside a nonjudicial foreclosure as a preferential transfer. Finally, First Federal argues even if the foreclosure is set aside under § 547(b), then the foreclosure ought not be set aside in its entirety; rather, it maintains that it should be required to pay to the Debtor's estate only that amount that First Federal received in excess of what it could have received in a Chapter 7 distribution.

In order to have a transaction set aside as a fraudulent conveyance under § 548 of the bankruptcy code, a party must establish three facts. First, the transfer must have taken place within one year of the filing of the bankruptcy petition. That is certainly the case here, as the petition was filed within an hour after the foreclosure was completed. Second, the debtor must receive less than a "reasonably equivalent value" for the transfer. Third, the debtor must be insolvent on the date the transfer was made, or become insolvent as a result of the transfer. The latter is clearly established in this case as the Standard Building was the Debtor's only substantial asset.

First Federal does not dispute that the first and third elements of a fraudulent transfer have been established. However, it argues that the Debtor did receive "reasonably equivalent value" for its property. It bases this conclusion on two arguments. First, it argues that the court's findings regarding the FMV of the Standard Building were clearly erroneous. Second, it argues that *Durrett* did not lay down a rigid 70% rule, and that even if the bankruptcy court's valuation was correct, Debtor received an amount sufficient to prohibit a finding that the foreclosure was a fraudulent transfer.

■ The court turns first to First Federal's argument regarding the *Durrett* rule.

---

1. Two appraisers gave testimony at the trial. In addition, the court reconsidered the evidence offered by First Federal at the preliminary injunction hearing, which was presented by an

appraiser by the name of David I. Sammons. First Federal's expert at trial was Stewart Wight. Debtor's expert was Claude R. Moore.

In that case, the former Fifth Circuit held that a debtor who had received 57% of the estimated fair market value of his property had not received "reasonably equivalent value" under § 548, and that the court could not, at the time, uncover any case which had held that receiving less than 70% of the FMV was "reasonably equivalent value." Cases following *Durrett* in the Fifth and Eleventh Circuits have used the *Durrett* court's dicta regarding the 70% figure to establish a "bright line" 70% rule, i.e., a transfer will not result in "reasonably equivalent value" unless the debtor receives at least 70% of the fair market value of his property.

The court agrees with First Federal that this result was not inevitable; the language of *Durrett* did not really require establishment of a bright line rule, and, as this case illustrates, a bright line rule sometimes triggers some rather nit-picky number crunching. Debtor's own expert arrived at a figure that was within 2% of the 70% figure. For this and other reasons, the "bright line" rule established by cases interpreting *Durrett* has often been criticized.[2] However, as Debtor rightly notes, the 70% rule is now *considered* binding in this circuit, and this court is unwilling to accept First Federal's invitation to reinterpret binding precedent. Until and unless the Eleventh Circuit decides to reassess the implications of *Durrett,* this court will continue to apply the "bright line" figure of 70%.

■ The court now turns to the valuation issue. First Federal challenges the court's conclusions regarding the Standard Building's fair market value on several grounds. First, it argues that Debtor's expert's amended valuation, which the court deemed the most credible, overestimated the number of square feet available for rental. Second, it argues that the rental rates used by Debtor's expert, Mr. Moore, to estimate potential income were inflated. It also argues that the occupancy rate used by Mr. Moore was excessive in

light of the building's income-producing history, and that Mr. Moore underestimated the operating expenses necessary to determine potential income because he underestimated the amount of property taxes due by $12,000.

While acknowledging that this is a very close case, the court must conclude that First Federal has failed to demonstrate that the bankruptcy court's findings were clearly erroneous. With respect to the amount of rental space available, the court must point out that Mr. Moore's estimate differed in an insubstantial amount from that offered by First Federal's first expert, Mr. Sammons. With respect to the rental rate and occupancy rate used to predict income, the court agrees that the numbers used by Mr. Moore seem generous in light of the buildings poor track record. However, First Federal has not pointed the court to any evidence in the record which would allow it to conclude that the figures used by Mr. Moore were so out of line with economic reality as to be clearly erroneous. The court is especially mindful of the fact that the bankruptcy court was in a better position to evaluate the experts' demeanor during cross-examination, and that Defendant's expert's analysis was discredited to some degree when he was questioned by Debtor's counsel. Appellant must do more than give the court reason to disagree with the bankruptcy court's findings; it must demonstrate that they are unsubstantiated. This First Federal has not done.

The same is true with respect to First Federal's argument that the tax figure used by Mr. Moore in assessing expenses was too low. First Federal's own expert indicated that the full $30,000 in tax liability ought not to be figured into the expense total for the first year of operation, because an appeal of the tax assessment would likely result in decreased liability pending renovation of the building. In light of this testimony, the court cannot say that the bankruptcy court erred in deciding that Mr. Moore's figures were the

**2.** *See, e.g., In Re Perdido Bay Country/Club Estates, Inc.* 23 B.R. 36 (Bankr.S.D.Fla.1982); *In*

*Re Coleman,* 21 B.R. 832 (Bankr.S.D.Tex.1982).

**224**

most credible. Thus, the court will affirm the bankruptcy court's finding that the building's FMV at the time of foreclosure was $3,067,000. Applying the *Durrett* rule, this means that Debtor received only 68% of the FMV of its asset, and therefore the bankruptcy court correctly held that the foreclosure should be set aside as a fraudulent transfer, a result which is particularly fitting given First Federal's actions concerning the foreclosure.[3]

 Strictly speaking, it is not necessary to evaluate Debtor's claim under § 547 if the foreclosure is to be set aside under § 548. However, the court is aware that the question of whether § 547 applies to a nonjudicial foreclosure is an important one, and will therefore address it to maintain the clarity of the record in this case. In this respect the court agrees with the analysis set out by Judge Kahn in his most recent order in the case of *Park North Partners, Ltd. v. Park North Associates,* 85 B.R. 916 (Bankr.N.D.Ga.1988), and holds that the provision regarding the setting aside of preferences in § 547 of the bankruptcy code does not apply to nonjudicial foreclosures.[4] As Judge Kahn pointed out in *Park North,* while the literal language of § 547 seems to apply to transactions such as nonjudicial foreclosures, conceptually a foreclosure does not fit within the "preference" category. The preference provision applies to those creditors who by virtue of a pre-petition transfer receive more than they would "under the distributive provisions of the bankruptcy code." Fully secured mortgage holders are not entitled to anything under the *"distributive provisions"* of the bankruptcy code, precisely because they have liens covering

specific assets. Thus, § 547 does not apply to validly executed nonjudicial foreclosures. However, the result reached by the bankruptcy court in this case will be affirmed given the results reached by the court in applying § 548.

Accordingly, the judgment of the bankruptcy court entered October 29th, 1987 is AFFIRMED. The request for oral argument is DENIED.

---

3. Debtor also maintains that the bankruptcy court could also be affirmed on grounds that the transfer was fraudulent under Georgia law. However, the bankruptcy court made no specific findings to this effect for this court to evaluate. Given the court's decision to affirm under § 548, it is not necessary to remand the case for findings regarding Debtor's state law fraud claims.

4. In *Park North,* the district court, Judge Hall, determined that § 547 did apply to nonjudicial foreclosures; he then remanded the case to the bankruptcy court for a determination of wheth-

er the creditor in that case received more through a foreclosure than it would have in a bankruptcy distribution. On remand, Judge Kahn urged the district court to reconsider its holding that § 547 applied to such transactions, noting that the issue had only been addressed in a "cursory" manner by the bankruptcy court prior to the initial appeal, and explaining, in a manner which persuaded this court, that § 547 ought never apply to nonjudicial foreclosures. Judge Hall has not yet addressed the issue post-remand.