In re NATIONAL ENVIRONMENTAL SYSTEMS CORPORATION, Debtor.

NATIONAL ENVIRONMENTAL SYSTEMS CORPORATION, Plaintiff,

v.

LONG POND REALTY TRUST and Joseph Davis, Defendants.

Bankruptcy No. 88–79.
Adv. No. 88–13.

United States Bankruptcy Court,
D. New Hampshire.

Sept. 29, 1989.

John M. Reynolds, Reynolds & Park, Keene, N.H., for Long Pond Realty Trust.

Michael Gilleran, Shafner & Gilleran, Boston, Mass., for National Environmental Systems Corp.

Richard M. Zinner, Friedman & Atherton, Boston, Mass., for Joseph Davis.

Mark J. Welzenbach, Sulloway, Hollis & Soden, Concord, N.H., for Bank of Boston.

MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

This chapter 11 adversary proceeding involves a complaint filed by the plaintiff, National Environmental Systems Corporation ("NESCO"), against the defendants Long Pond Realty Trust and Joseph Davis. The claim is that the pre-bankruptcy non-judicial foreclosure sale of the debtor's real property should be set aside as a fraudulent transfer pursuant to 11 U.S.C. § 548(a)(2).

This is a core proceeding under 28 U.S.C. § 157(b)(2)(H). This Court has jurisdiction to hear the matter pursuant to 28 U.S.C. § 1334, and the general reference order dated February 1, 1985 by the U.S. District Court for New Hampshire.

This matter came on for trial on November 29 and 30, 1988. After trial, the Court made findings of fact, but took the matter under submission to permit the parties to file briefs.

## FINDINGS OF FACT

The court dictated its detailed findings of fact into the record at the conclusion of the trial. Those findings of fact are incorporated herein by reference and will not be set forth again in detail. However, briefly summarized the more important findings of fact are as follows:

1. Defendant Long Pond Realty Trust acquired a parcel of undeveloped land located in Northwood, New Hampshire in 1974.

2. The subject property consists of 292 acres and has 4400 feet of frontage on Long Pond. It is more particularly described in the appraiser's report, dated September 15, 1987, offered and received into evidence on behalf of the plaintiff, as follows:

The neighborhood of the subject property is best defined as that portion of the Town of Northwood north of U.S. Routes 4 and 202/NH Route 9, and west of the intersection of Main Street and U.S. Routes 4 and 202 and New Hampshire Route 9. The neighborhood is rural in character, and with the exception of the land immediately surrounding Jenness Pond, and along Jenness Pond Road, is generally undeveloped. Residential properties predominate and include both year-round and seasonal housing. Seasonal housing is concentrated around the two ponds in the neighborhood: Long Pond and Jenness Pond. Jenness Pond has excellent potential for recreation, being classified by the State as 'oligotrophic' (a young lake with clear water, having average weed growth) and being approximately 232 acres in area. Long Pond is classified as an 'eutrophic' lake (an old lake with low visibility through the water, having abundant weed growth) and being 100 acres in area.

\* \* \* \* \* \*

The subject property consists of 292 acres of land located Northwood, New Hampshire. This property was 4,400 feet frontage on Long Pond, and 1,150 feet of frontage on Jenness Pond Road. All of this land is, at present, undeveloped. Most of the land is hilly and stony, with slopes from 8 to 15 per cent. There are no municipal services available from the Town of Northwood. One of the property's primary assets is its convenience to Route 4.

It is the appraiser's opinion that the highest and best use of the subject would be residential development.

3. Defendant Long Pond Realty Trust offered the subject property for sale initially at $270,000.00. Then, in 1980 the property was offered for $300,000.00. During 1985 and 1986 the property was offered for sale for $400,000.00. Notwithstanding these listings, the Trust received no bona fide offers for the property until the plaintiff's offer made in January of 1986. Long Pond Realty Trust did no appraisal in 1985 or 1986 nor did it consider any comparable sales in the area in determining its asking price of $400,000.00.

4. In January 1986, the plaintiff purchased the property for the price of $400,000.00. There were no negotiations about price; the buyer simply accepted the asking price. The plaintiff paid $40,000.00 down and issued a $360,000 nonrecourse note without any personal guarantees by any principals of NESCO (officers, directors or shareholders), with the note due on August 5, 1986. (No interest would accumulate on the note prior to the due date.) The economic substance of this transaction was quite close to a simple option to purchase in which NESCO would complete the purchase if it could get financing for the remaining $360,000 by August 5, 1986. NESCO could have walked away without any further liability to Long Pond Realty Trust in August other than the initial $40,000.00 down payment.

5. The following excerpt from the appraisal report discusses the prospects for NESCO's proposed development:

In March 1986 a subdivision plan was submitted to the Northwood Planning

**6**

Board by the owners, NESCO. According to the minutes of the Planning Board meeting, Board members expressed concern over the small lot sizes on the proposed plan. In addition, in the event that a septic system should malfunction, the hilly terrain of the subject property would aggravate problems of run-off and could pose a pollution threat to the lake. Board members were also concerned about the lack of green space provided on the proposed plan, and the inclusion of only one exit from the property. The proposed plan was not approved.

Recent conversations with town officials indicate that they are concerned about attracting too many boaters to Long Pond, which, at 100 acres, is fairly small. It is expected that the Master Plan for the Town of Northwood, which will be delivered by the Strafford Regional Planning Commission within the next month, will propose some cluster of housing zoning for the Town. Town officials suggested that the subject property might be a good site for this form of development.

6. The Town of Northwood adopted the following ordinance designed to restrict development in March 1986:

Ordinances and Subdivision Regulations, Article 3, Regulation A, New Developments:

It shall be the duty of the Planning Board to limit subdivision approval of land for each subdivider, his heirs and assigns, including corporations, into lots or family units of not more than ten for each subdivider within a period of one year, commencing upon the adoption of this Article at town meeting on March 11, 1986.

7. The plaintiff failed to pay the mortgage note when due on August 5, 1988 because it could not obtain financing.

8. Defendant Long Pond Realty Trust delayed foreclosure following that default and gave the plaintiff further time to attempt to get financing or to resell to take care of the $360,000.00 obligation. After the default, the note did provide for interest at the rate of fifteen per cent per year.

However, the plaintiff paid nothing further to Long Pond Realty Trust beyond the initial $40,000.00 down payment, and has never paid anything to Long Pond Realty Trust other than that amount.

9. The foreclosure sale was set and noticed for February 20, 1987. At that time, the plaintiff owed the defendant Long Pond Realty Trust the $360,000.00 in principal, plus $24,719.25 of accrued interest, for a total secured debt of $384,719.25. At that time, there were also unpaid taxes against the property in the amount of $6,218.42.

10. Defendant Long Pond Realty Trust, through its attorney, noticed the sale by publication in the *Portsmouth Herald* newspaper on three successive Tuesdays, but did not publish a notice in any other newspaper. The City of Portsmouth is thirty-seven miles from the subject property. The City of Concord, which has the *Concord Monitor* as the paper of general circulation, is sixteen miles from the subject property. The City of Manchester, which has the *Union Leader* as the paper of general circulation, is thirty-four miles from the subject property.

11. To have obtained optimum bidding at the foreclosure sale it would have been desirable to have advertised this foreclosure sale in at least the *Concord Monitor*, the *Union Leader*, and the *Boston Globe*, rather than solely in the *Portsmouth Herald*. Both George Hanson and Joseph Davis apparently learned of the availability of the property without any such advertisement, but there would have been a better chance of competitive bidding on the property if it were advertised in Concord, which is much closer than Portsmouth, and in Manchester, which is a statewide circulation paper, and in the *Boston Globe*, which is a regional circulation paper.

12. At the foreclosure sale on February 20, 1987 the only bidder was the defendant Long Pond Realty Trust. They bid the amount of $380,000.00, which was approximately the amount of the mortgage debt at that time. There were no other bids. The property was conveyed to Richard Conway

as trustee by foreclosure deed subject to the unpaid taxes.

13. The agents of the defendant Long Pond Realty Trust subjectively believed that the market value of the property at the time of the foreclosure sale was approximately $400,000.00. They did not however get an independent appraisal before the foreclosure to determine the actual value of the property under current market conditions. They resided a considerable distance from the subject property.

14. John Reynolds, of Long Pond Realty Trust, was anxious to get the property foreclosed and resold after a $35,000.00 down payment check from a sales transaction with another prospective purchaser bounced. He was caught in an awkward situation since he had already paid taxes out of what he thought was deposited funds, and had distributed the balance to the beneficiaries of the trust. When the check bounced he was obliged to take out a personal loan for that amount and had that obligation and the interest running on it until the property could be resold. However, these events did not lead him knowingly to a foreclose or resell at lower than what he believed the market value of the property to be.

15. On February 24, 1987, Richard Conway as trustee signed a purchase and sale agreement with defendant Joseph Davis for the amount of $410,000.00. Defendant Joseph Davis signed the purchase and sale agreement on March 3, 1987. The resale agreement provided for $50,000.00 down, which was paid by Davis, and provided for a closing with payment of the balance on June 5, 1987. However, the closing was deferred pending state court litigation initiated by NESCO and/or one or more of its principals before the closing date. This litigation was prompted by Bank of Boston, the only non-insider unsecured creditor of NESCO, which had a sizeable unpaid loan outstanding and no substantial assets left in NESCO after the foreclosure. It has been stipulated in these proceedings that "Davis paid $50,000.00 down, and did not pay the balance of $360,000.00 because of

pending and expected litigation," and that situation continues to the present.

16. Defendant Joseph Davis had no prior connection to defendant Long Pond Realty Trust or its beneficiaries or agents. Joseph Davis took the property for value and in good faith.

17. There was no collusion on the part of defendant Long Pond Realty Trust in reselling the property to defendant Davis in the sense that Long Pond Realty Trust had any knowledge or belief that the property was worth substantially more than approximately $400,000.00.

18. The Court received considerable evidence by both parties as to the value of the property as of the February 20, 1987 foreclosure sale date. This evidence included the testimony of an appraiser as to a fair market value of $790,000.00 as of that date, and contra indications of value proferred by the defendant Long Pond Realty Trust. The Court explained in some detail in its dictated findings at the conclusion of the hearing what weight it would give to each of these indicia of value and came to a general conclusion on the totality of the evidence before the Court. Taking all of the factors involved into account, the Court found that the foreclosure-impacted market value of the property as of February 20, 1987 *pertinent to a § 548 determination* was $590,000.00, without consideration of a broker's commission or alternative sale expenses, and that that value should be further adjusted by $45,000.00 for such commission or sale expenses. Accordingly the court found and hereby redetermines that the final net impacted value appropriate for a determination in the context of a § 548 avoidance action is $555,000.00. Accordingly, the bid price of $380,000.00 by the defendant Long Pond Realty Trust at the foreclosure sale represents 68 percent of the net impacted value as so determined.

19. The Chapter 11 petition was filed in this case on February 17, 1988. The Chapter 11 schedules indicate that the only creditors involved in this case are: Paul Keating, who was a stockholder and/or officer or director of the Debtor, for $22,500.00 for "Loans and Services—1985–1988"; Leo G.

Carr, who also was an officer, and a shareholder and/or director of the corporation, for $15,000.00 for "Services—1985–1988"; the Town of Northwood for 1986 and 1987 taxes in the amount of approximately $10,-000.00; the Secretary of State of New Hampshire for taxes in the amount of $240.00; and, the Bank of Boston for unsecured loans in the amount of $106,000.00 (undisputed) and $85,000.00 (disputed). Although the Court indicated at the close of the hearing its belief that the Bank of Boston had not filed a proof of claim in this case, a review of the record indicates that the Bank did file a claim on December 19, 1988 in the amount of $219,842.79.

## LEGAL STANDARD

### A. *The Statute*

The issue in this case is whether a non-judicial foreclosure sale should be set aside as a fraudulent transfer pursuant to 11 U.S.C. § 548(a)(2). The relevant part of this statutory provision reads as follows:

§ 548 Fraudulent transfers and obligations.

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

\* \* \* \* \* \*

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; . . .

The parties agree that a transfer [1] of the debtor's property was made within one year of the filing date, and that the debtor became insolvent. The question before this Court is whether the transfer was for less

than a "reasonably equivalent value." This is a question of first impression in this jurisdiction. However, other courts have considered this question, but reached different conclusions. Those decisions are now analyzed.

### B. *Competing Case Law*

There are three distinct answers to this question. The first group of cases stem from the initial decision on this issue in *Durrett v. Washington Nat'l Ins. Co.*, 621 F.2d 201 (5th Cir.1980). The case was decided under § 67(d) of the old Bankruptcy Act which stated a transfer is fraudulent if the debtor does not receive a "fair equivalent". The Court held that the payment of $115,400 for real property at a foreclosure sale, which was worth $200,000.00, or 57.7 percent of the fair market value, was not a "fair equivalent." In doing so, the Court used the following language:

We have been unable to locate a decision of any district or appellate court dealing only with a transfer of real property as the subject of attack under section 67(d) of the Act, which has approved the transfer for less than 70 percent of the market value of the property.

*Id.* at 203.

This language has led a number of courts to use the standard that a foreclosure sale must yield 70% or more of the fair market value of the property or the sale is void under § 548(a)(2). See, e.g., *First Federal Sav. & Loan Ass'n v. Standard Building Assoc., Ltd.*, 87 B.R. 221 (N.D.Ga.1988); *In re Cole*, 81 B.R. 326 (Bankr.E.D.Pa.1988); *Matter of IPI Liberty Village Assoc.*, 92 B.R. 882 (Bankr.W.D. Mo.1987); and *In re Thompson*, 18 B.R. 67 (Bankr.E.D.Tenn.1982). The apparent rationale for adopting a mechanical rule over a more flexible standard is a preference for a fixed and certain standard. See *Matter of Littleton*, 82 B.R. 640 (Bankr.S.D.Ga. 1988).

A second group of courts expressly reject *Durrett* and hold that a regularly con-

---

1. There is no dispute that a "transfer" occurred within the meaning of the statute. This issue, which was extensively litigated in the early cases decided on this issue, appears to be re-

solved by the 1984 amendments. See *Bundles v. Baker*, 856 F.2d 815, 817 n. 2 (7th Cir.1988); *In re Lindsay*, 98 B.R. 983, 986–88 (Bankr. S.D. Cal.1989).

ducted non-collusive foreclosure sale is conclusively presumed to yield a "reasonably equivalent value" for the property transferred. The leading case for this position is *In re Madrid*, 21 B.R. 424 (9th Cir. BAP 1982), aff'd on other grounds 725 F.2d 1197 (9th Cir.1984), cert. denied 469 U.S. 833, 105 S.Ct. 125, 83 L.Ed.2d 66 (1984). The Court's rationale is that state procedures are adequate to ensure a fair price. *Id.* at 426–27. In addition, it has been argued that the *Durrett* rule would create a cloud over titles that would inhibit purchasers from buying at the foreclosure sale and thus depress the sale price, and also reduce the availability of mortgages. See *In re Ristich*, 57 B.R. 568, 577 (Bankr.N.D.Ill.1986); *Abramson v. Lakewood Bank & Trust Co.*, 647 F.2d 547, 550 (5th Cir.1981) (Clark, J., dissenting). Other courts have adopted the *Madrid* approach. See, e.g., *In the Matter of Winshall Settlor's Trust*, 758 F.2d 1136 (6th Cir.1985); *In re Verna*, 58 B.R. 246 (Bankr.C.D.Cal.1986); *In re Upham*, 48 B.R. 695 (Bankr.W.D.N.Y.1985); and *In re Strauser*, 40 B.R. 868 (Bankr. N.D. Ohio 1984).

The third group of courts have adopted the position that there should be a federal determination of whether "reasonably equivalent value" was given for property at a foreclosure sale and this determination should be made by reviewing all the circumstances surrounding the sale, not just price. The leading case for this position is *Bundles v. Baker*, 856 F.2d 815 (7th Cir. 1988). The Seventh Circuit reasoned that Section 548 establishes a federal basis for setting aside foreclosure sales apart from state law, and that reasonable equivalence should depend on examining both the sale price and the procedures used to make the sale a success, such as advertising, appraisal, and competitive bidding. Other courts have adopted a similar stance. See, e.g., *In re Hulm*, 738 F.2d 323 (8th Cir.1984); *In re Garrison*, 48 B.R. 837 (D.Colo.1985); *In re Lindsay*, 98 B.R. 983 (Bankr.S.D.Cal.1989); *In re Pruitt*, 72 B.R. 436 (Bankr.E.D.N.Y.

1987); *In re General Indus., Inc.*, 79 B.R. 124 (Bankr.D.Mass.1987); *In re Ruebeck*, 55 B.R. 163 (Bankr.D.Mass.1985); *In re Perdido Bay Country Club Estates, Inc.*, 23 B.R. 36 (Bankr. S.D. Fla. 1982).

The Court of Appeals for the First Circuit has not had occasion to pass on this question.

### C. *The Position This Court Adopts*

■ This Court adopts the *Bundles* flexibility rule in the absence of any other guidance by binding precedent in this Circuit. The Court so rules because the statute requires a federal determination of "reasonably equivalent value" in foreclosure cases, and because the practical effect of such a rule is superior to the other alternatives.

The statute is clear that a foreclosure sale may be set aside if made for less than "reasonably equivalent value", and nowhere does that standard depend on state law. The statute thus compels this Court to make a determination independent of what state law may say. *Madrid* and that group of cases impermissibly alter the plain meaning of the statute by using state law to satisfy a federal standard. Moreover, the Supreme Court has specifically held in the bankruptcy context that if the statute is clear on its face it must be strictly followed. See *United States v. Ron Pair Enterprises, Inc.*, —— U.S. ——, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *Central Trust Co. v. Creditors' Committee*, 454 U.S. 354, 359–60 102 S.Ct. 695, 698, 70 L.Ed.2d 542 (1982).[2]

The argument of the courts following *Madrid* that state procedures are adequate to ensure a fair price is certainly flawed if these courts mean that merely following the statutory requirements, like those of N.H. Rev.Stat.Ann. § 479:25 (Supp.1988), and conducting the sale without any irregularities or collusion, is sufficient. All that is required by that statute is a legal notice that runs three consecutive Tuesdays in a local newspaper and notice to the debtor.

---

**2.** What little legislative history there is indicates that Congress has not attempted to solve the *"Durrett* problem." See *Bundles v. Baker* 856 F.2d 815, 821 n. 8 (7th Cir.1988). In fact, in

1984 the *Madrid* rule was offered as an amendment, but did not become law. *Id.* at 821. Therefore, we are only left with the statute's plain language.

All too often the only bidder is the mortgagee who only bids in the amount of its lien.[3]

The supporters of *Madrid* have also suggested that a federal determination of "reasonably equivalent value" would create a cloud upon titles. This Court has several responses. First, following the clear meaning of the statute is paramount to such a policy concern. Second, such a concern may not materialize. The limited evidence is that this problem has not developed. See Schuckman, *Data on the Durrett Controversy*, 9 Cardozo L.Rev. 605 (1987). Third, secured lenders can protect themselves—and calm title examiners—by making a record of the reasonable steps undertaken to obtain a fair price at the foreclosure sale in accordance with § 548 of the Bankruptcy Code as well as state law requirements. Cf. *In re General Industries, Inc.*, 79 B.R. 124, 133 (Bankr.D.Mass.1987).

Having determined that a federal rule is required, this court will not adopt the *Durrett* 70 percent rule that some courts have used, in view of its rigidity and the absence of any statutory mandate to create such a

fixed rule. This Court instead will examine price, procedures, and market conditions to determine on a case-by-case basis whether reasonably equivalent value was achieved—basically following the approach indicated in the *Bundles* decision. Specifically, this Court will examine the inescapable effect of a foreclosure sale on value, the disparity between the foreclosure price and the net market value, the extent of competitive bidding at the sale, efforts to stimulate competitive bidding, the extent of advertising, whether an outside appraisal should have been obtained, and whether giving notice to local brokers would have been effective in promoting the sale.

Perhaps some additional comments are justified in order to emphasize why this court strongly believes that a *flexible* approach is far more appropriate than an *arithmetical* approach in interpreting and enforcing the provisions of § 548 of the Bankruptcy Code—in the context of foreclosure sales conducted in accordance with the procedural requirements of state law.[4] I have referred above to the "inescapable effect of a foreclosure sale on value" as

---

**3.** The State of New Hampshire has in fact recognized in a recent decision by its Supreme Court that mere compliance with the minimum procedural requirements of the foreclosure statute may not insulate the mortgagee from attack on the foreclosure sale by the mortgagor. In *Murphy v. Financial Dev. Corp.*, 126 N.H. 536, 495 A.2d 1245 (1985), the New Hampshire Supreme Court ruled the mortgagee had not exercised "due diligence" to ensure a fair price was obtained at the foreclosure sale. The Court found: the property sold was not reappraised as it should have been; the lenders were the only bidders at the sale; the lenders had reason to know they could quickly resell the property for a profit after the foreclosure; the lenders did not postpone the auction and advertise commercially to acquire other bidders; and, the lenders admitted they were only concerned about making themselves "whole". Moreover, in making its decision, the Court quoted the Commissioners' Comment to section 3-508 of the Uniform Land Transactions Act to the effect that:

"The requirement that the sale be conducted in a reasonable manner, including the advertising aspects, requires that the person conducting the sale use the ordinary methods of making buyers aware that are used when an owner is voluntarily selling his land. Thus an advertisement in the portion of a daily newspaper where these ads are placed or, in appropriate cases such as the sale of an industrial

plant, a display advertisement in the financial sections of the daily newspaper may be the most reasonable method. In other cases employment of a professional real estate agency may be the more reasonable method. It is unlikely that an advertisement in a legal publication among other legal notices would qualify as a commercially reasonable method of sale advertising."

*Id.* 126 N.H. at 544, 495 A.2d at 1251 (quoting 13 Uniform Laws Annotated 704 (West 1980)).

Thus, New Hampshire by case law decision in effect provides a fairly comparable standard regarding foreclosure sales to the federal standard for Bankruptcy Code § 548 purposes established by the decision in the present case. However, the federal standard cannot be legally *defined* by the happenstance of a particular state's view as to the sanctity of procedurally-correct foreclosure sales.

**4.** This court has previously noted the need for comparable flexibility in interpreting "reasonably equivalent value" in the context of fraudulent transfer attacks under § 548 on pre-bankruptcy property settlement agreements reached in divorce proceedings in accordance with State marital property law involving one of the now-bankrupt spouses. See *In re Riso*, 102 B.R. 280, 289–90 (Bankr.D.N.H.1989); *In re Sorlucco*, 68 B.R. 748, 753 (Bankr.D.N.H.1986).

one of the factors that must be taken into account in determining a § 548 attack upon the price obtained at a foreclosure sale. If that factor is *not* taken into account then § 548 in effect will allow mortgagors—who by definition have defaulted on the financing obtained in order to realize fair market value from their investment—to "start all over again at square one" as though that default had not occurred and the property had not come "under the hammer" for a foreclosure sale. Flexibility is needed in interpreting § 548 to assure that the foreclosing lender acts reasonably in the circumstances to obtain the maximum value available *in those circumstances* but not to require the lender to "refinance" the transaction as though the borrower had just walked in the door with its loan application.[5]

The most troubling problem in interpreting § 548 in the foreclosure sale context has in fact been the question of the appropriate meaning of "value" in that context. Bankruptcy Judge Lavien in *In re Ruebeck*, 55 B.R. 163, 170 (Bankr.D.Mass.1985), touches on this point as follows:

> Under the best of conditions, a foreclosure sale falls short of fitting the definition of fair market value, which requires a willing buyer and seller. A foreclosure sale is held under duress, when all other options are closed to the seller. This doesn't mean that it would be impossible to conduct a foreclosure sale in such a way that the price received was representative of value. The bankruptcy court would probably accept a sale that did not shock its conscience and was conducted in the same manner that a prudent man would advertise his own property for sale. Essentially, this means that the Court would have to be satisfied that the mortgagee had taken all reasonable steps not only to come out whole, but to realize a fair price as well. It is no answer to suggest that the mortgagor could protect himself by bidding if

the price were too low. For if the debtor were in a position to bid, his property would not be under the hammer.

Bankruptcy Judge Queenan in *In re General Industries, Inc.*, 79 B.R. 124, 130 (Bankr.D.Mass.1987), also has some valuable comments with regard to the concept of "value" in the foreclosure sale context:

> The elusiveness of value is particularly acute in the context of a foreclosure sale. Some experts, such as one who testified here, believe that a public foreclosure sale at public auction will probably realize a value which is less than fair market value because there is likely to be one bidder at the auction who wants the property much more than other bidders but who will necessarily stop his bidding when the others drop out. Those holding this view call such a value "liquidation value," and assert that it is less than fair market value even if the auction is well-publicized and properly-run. The proponents of this liquidation value concept also contend that a public foreclosure sale will likely be attended largely by individuals who want to purchase for resale at a profit, rather than by consumers who would presumably be willing to pay full "retail" value. See R. Jordan and W. Warren, *Bankruptcy* 407–08 (1985). And they point out that the traditional concept of fair market value presumes a sales effort over a sustained period of time during which the seller can wait for the "right" buyer, whereas the sales efforts in public foreclosure usually encompass a shorter period. *Id.*

The court of appeals in *Bundles v. Baker*, 856 F.2d 815, 824 (7th Cir.1988), argues persuasively for a flexible approach to the concept of "value" for § 548 purposes as follows:

> If anything is clear from the various uses of the word "value" in the Code, it is that Congress did not mean fair market value when it used the term reasonably equivalent value. On the other

---

**5.** Indeed in the present case it can be noted that the debtor has been able to tie up the property in question in excess of three-and-a-half-years with one payment of $40,000.00, and a nonrecourse note issued by the debtor corporation with no personal guarantees or other obligations binding the principals of the corporate debtor. Moreover, the debtor was not even obligated to pay interest until the six-month due date on the promissory note.

hand, Congress' conscious use of a federal standard suggests that it did not believe that the expedient of relying entirely on state foreclosure law would protect adequately federal interests. "State law's sanction of exchanges in foreclosures which are not reasonably equivalent gives effect to state contract and foreclosure policy but may overlook the interests of other creditors of the debtor." *In re Richardson,* 23 B.R. [434] at 447 [(Bankr.D.Utah 1982)].

In our view, in defining reasonably equivalent value, the court should neither grant a conclusive presumption in favor of a purchaser at a regularly conducted, noncollusive foreclosure sale, nor limit its inquiry to a simple comparison of the sale price to the fair market value. Reasonable equivalence should depend on all the facts of each case. This middle ground has been adopted by several of the bankruptcy courts. See, e.g., *General Indus. v. Shea (In re General Indus.),* 79 B.R. 124 (Bankr.D.Mass.1987); *Adwar v. Capgro Leasing Corp. (In re Adwar),* 55 B.R. 111 (Bankr.E.D.N.Y.1985); *Ruebeck v. Attleboro Sav. Bank (In re Ruebeck),* 55 B.R. 163 (Bankr.D.Mass.1985); *First Fed. Sav. & Loan Ass'n v. Hulm (In re Hulm),* 45 B.R. 523 (Bankr.D.N.D. 1984); *In re Richardson,* 23 B.R. at 448; see also *In re Madrid,* 21 B.R. at 428 (Volinn, J., dissenting) (arguing that the concept of reasonably equivalent value requires that the trial court examine the consideration received in a foreclosure sale in the factual context of a particular case and concluding that the price paid at a regularly conducted foreclosure sale should be given, at best, a strong presumption of adequacy).

The implementation of this approach requires case-by-case adjudication. In determining whether property was sold for reasonably equivalent value, the bankruptcy court must, of course, be mindful constantly of the purpose of section 548's avoiding powers—to preserve the assets of the estate. See *Martin v. Phillips (In re Butcher),* 58 B.R. 128, 130 (Bankr.E.D.Tenn.1986); *In re Richardson,* 23 B.R. at 447. This considera-

tion requires that, in determining reasonably equivalent value, the court must focus on what the debtor received in return for what he surrendered. See *In re Butcher,* 58 B.R. at 130; *Meister v. Jamison, (In re Jamison),* 21 B.R. 380, 382 (Bankr. D. Conn.1982). Consequently, it is appropriate to consider as a starting point, the fair market value. However, the fact that the sale was the result of a foreclosure rather than an arm's length transaction between a willing buyer and a willing seller is also of considerable importance. Therefore, the bankruptcy court must focus ultimately on the fair market value as affected by the fact of foreclosure.

The foregoing comments by other courts serve to support the decision here reached that the language "reasonably equivalent value" used in § 548 of the Bankruptcy Code permits a flexible approach that takes into account all aspects of the foreclosure sale transaction. Justice Holmes once remarked in an opinion dealing with judicial construction of a constitutional provision that "[s]ome play must be allowed for the joints of the machine." *Missouri, Kansas & Texas Ry. Co. v. May,* 194 U.S. 267, 270, 24 S.Ct. 638, 639, 48 L.Ed. 971 (1904). In my opinion § 548 of the Bankruptcy Code likewise requires such "play" in its interpretation if a totally unintended and comprehensive disruption of state foreclosure procedures is to be avoided. The alternative ultimately would result in federal preemption under the constitutional supremacy clause of all foreclosure sales—a result obviously not intended by Congress. In my opinion Congress used the more flexible language "reasonably equivalent value" in § 548—rather than a more precise and rigid formulation—for good reason.

## CONCLUSION

■ The foreclosure sale here in question resulted, as noted above, in a foreclosure sale price of 68 percent of the net foreclosure-impacted value of the property as of the foreclosure sale date. If this were the only factor before the court, it would be arguable whether a § 548 attack

should be able to undo the foreclosure sale. However, on the record before this court, the actions and procedures used by the foreclosing mortgagee Long Pond Realty Trust did not come close to those procedures and actions that a mortgagee should employ to realize not only the amount necessary to pay off its lien but to realize in a reasonable manner any equity interest of the mortgagor. The property was advertised only by a legal notice buried in the legal notice columns of a newspaper published some thirty-seven miles away from the subject property, when much more effective notice could have been accomplished in two New Hampshire papers closer to the subject property, and in a regional paper that was appropriate considering the substantial size and value of the property in question. In the circumstances, display ads as well as legal notice ads should have been employed, to attract the attention of interested developers in the region to a sizable parcel of raw land situated in a very desirable area for further development in the State of New Hampshire. The relatively quick resale to the defendant Joseph Davis following the foreclosure, without any collusion or prior dealings, demonstrates that there was market interest in the property at the time of the foreclosure sale.

This case has a peculiar factor in that I have found that the principals of the defendant Long Pond Realty Trust subjectively had no idea of the substantially increased value of their property during the surge of real estate values that occurred in the mid-1980's in New Hampshire. From their standpoint, since they had sold the property only a year before for $400,000.00, it probably did not occur to them that the debtor had any great equity to preserve in the foreclosure process. This belief is confirmed by their action in reselling the property for only a modest increased amount of $410,000.00 a month after the foreclosure to the defendant Joseph Davis. These subjective beliefs however do not insulate the defendants from a § 548 attack on the objective facts of the present case. The substantial increase in land values in New Hampshire in the mid–1980's was a matter of general notoriety in this State and I believe created a duty upon the defendant Long Pond Realty Trust to obtain a more current appraisal of the property in question. The Trust in fact had obtained no appraisal of the property for a number of years and cannot rely here on the fact that its principals were oblivious, for whatever reason, to substantially increased value in the property in question. That increase would have been apparent to anyone else dealing with property in that area with a minimum amount of inquiry.

Considering all of the factors involved in this case I conclude that a judgment should be entered nullifying the foreclosure sale in question and revesting title in the debtor. Pursuant to a stipulation filed in the case the defendant Joseph Davis shall have a priority lien in the subject property in the sum of $50,000.00 (deposit) plus legal interest from February 24, 1987 and $3,978.89 (taxes) plus legal interest from March 4, 1987. The defendant Long Pond Realty Trust shall have a lien in the amount of $360,000 plus the contractual default rate of interest from August 5, 1986. Plaintiff shall submit a form of final judgment in accordance with this opinion within 10 days hereof, after circulating same to the defendants.