In re FIBSA FORWARDING,
INC., Debtor.

Mark Newman, Plaintiff,

v.

FIBSA Forwarding, Inc., Defendant.

Bankruptcy No. 98–50477–L2–11.
Adversary No. 98–5013.

United States Bankruptcy Court,
S.D. Texas,
Laredo Division.

Feb. 5, 1999.

Guadalupe Castillo, Laredo, TX, for defendant.

Marco A. "Tony" Ramos, Laredo, TX, for plaintiff.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

WESLEY W. STEEN, Bankruptcy Judge.

Plaintiff filed this adversary proceeding seeking a declaratory judgment that his purchase of certain property is not avoidable as a preferential transfer under Bankruptcy Code § 547. After the Defendant filed its answer, both parties filed motions for summary judgment, both stipulated to the facts relevant for determination of the matter by summary judgment, and both parties asked the Court to determine the case on the cross motions for summary judgment.

### JURISDICTION

The parties agree that the Court has core jurisdiction over the subject matter pursuant to 28 U.S.C. § 1334(b) and § 157(b)(2)(H).

### FACTS

The following facts are stipulated for the purposes of this motion:

1. On (and prior to) June 2, 1998, the Bank[1] held a secured claim and first lien against real property ("Collateral") owned by the Debtor.

2. On June 2, 1998, the Bank acquired the Collateral by foreclosure in a properly conducted, noncollusive foreclosure sale that complied with state law.

3. The deed of trust (under which the Bank foreclosed) was executed and recorded in 1993.

4. As of June 2, 1998, the amount of the debt (secured by the first lien) was $19,500.[2]

5. There was no other secured claim against the Collateral, except for an IRS lien (which was eliminated by the June 2 foreclosure).

6. On June 2, 1998, the Collateral was worth $50,000.

7. The Bank recorded its foreclosure deed on June 18, 1998.

8. On June 25, 1998, the Bank sold the property to Newman (Plaintiff) for $27,250. The deed to Newman was recorded the same day.

---

1. International Bank of Commerce.

2. This included, as of a time immediately prior to foreclosure:

| | |
|---|---|
| Principal | $12,726.52 |
| Interest to 6/2/98 | 154.75 |
| Property Taxes Paid | 3,498.73 |
| Attorneys Fees | 2,457.00 |
| Trustee's Fees | 663.00 |
| Total | $19,500.00 |

9. On August 31, 1998, (within 90 days of the foreclosure) the Debtor filed this bankruptcy case.

10. Excluding the real property that was foreclosed on June 2, the Debtor has (and had on June 2, 1998) $17,500 of assets.

11. Excluding the secured debt to the Bank, the Debtor owes (and owed on June 2, 1998) debts of $44,874.16, including $23,670 to various taxing authorities and $21,203.44 to various trade creditors.

12. The Debtor is a corporation and therefore has no exempt property.

## CONCLUSIONS FROM THE STIPULATED FACTS

As a consequence of the foreclosure, the Bank received $27,500 on account of its claim. If the Collateral had been sold under chapter 7 of the Bankruptcy Code, the chapter 7 trustee would (after payment of the sale expenses) have paid to the Bank the amount of its claim, $19,500.[3]

In a chapter 7 liquidation, after payment of the Bank, the remaining proceeds from the sale of the Collateral (approximately $30,500) plus the net amount realized from the sale of the Debtor's other assets would have been paid to unsecured creditors (first to unsecured creditors with priority claims and then to other unsecured creditors). Unsecured creditors would have received 100% of their claims. The balance of the net cash raised from the sale of assets by the Trustee would have been paid to the Debtor. The Debtor would receive approximately $3,000.

If the Collateral is not recovered by the Debtor in this bankruptcy case, the Bank will have made a $7,750 profit as a result of the foreclosure (it will have realized $27,250 on its $19,500 claim). Newman (the purchaser of the property from the Bank) will have acquired an asset worth $50,000 for a price of $27,500. But, the Debtor's creditors will not fare as well. The priority unsecured creditors (the IRS and various other governmental units) will be paid less than 74% of their claims. The unsecured creditors without priority claims will get nothing. The Debtor will get nothing.

## CONTENTIONS OF THE PARTIES

Both parties agree that this foreclosure is not a fraudulent transfer avoidable under Bankruptcy Code § 548: *BFP v. Resolution Trust Corporation,* 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994).

The Debtor contends that this transaction is avoidable under Bankruptcy Code § 547. Plaintiff contends that it is not.

## BANKRUPTCY CODE § 547

Under Bankruptcy Code § 547, the Debtor may avoid a transfer that meets the following requirements. The (i) transfer (ii) must be of an interest in the debtor's property. The transfer (iii) must be to or for the benefit of a creditor, and (iv) on account of an antecedent debt. The transfer must (v) have been made while the debtor was insolvent, (vi) within 90 days before the date that the bankruptcy petition was filed, and (vii) the transfer must allow the creditor to receive more than the creditor would have received by liquidation of the property under chapter 7 of the Bankruptcy Code.

Bankruptcy Code § 101(54) defines "transfer" as

every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property . . .

This language reflects a 1984 amendment that makes it clear that a foreclosure is a "transfer".[4]

There is really no dispute that the transfer (ii) was a transfer of the Debtor's property; (iii) was made to a creditor, (iv) was on account of an antecedent debt, and (vi) was made within 90 days prior to the date that the bankruptcy petition was filed.

The fifth element is contested: whether the transfer was made while the Debtor was insolvent. The Court concludes that the

---

3. Plus accrued interest, since the Bank was an oversecured creditor.

4. *BFP v. Resolution Trust Corporation,* 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994).

Debtor was not insolvent before the transfer on June 2, 1998, but was made·insolvent by the foreclosure.[5] Prior to the foreclosure the value of the Debtor's assets (including the Collateral) was $67,500 [6] and the Debtor's debts (including Bank's secured lien) was $64,374.16.[7] Subsequent to the foreclosure, the value of the Debtor's assets (excluding the Collateral) was $17,500 [8] and the Debtor's debts (excluding Bank's secured lien) was $44,874.14.[9] For reasons set forth below, I conclude that the transfer was not made while the Debtor was insolvent.

The final element is that a preferential transfer must allow the creditor to receive more than the creditor would have received in a chapter 7 liquidation. Although it seems very clear, (from the application of simple arithmetic) that the creditor received $7,750 more than the amount to which it was entitled in chapter 7, judicial precedent and policy appear to mandate the opposite conclusion.

### CONCLUSIONS OF LAW

■ Analysis of bankruptcy provisions usually focus on a debtor's bankruptcy rights. Doing so, however, misses a central focus of bankruptcy law: the prevention of "grab" tactics that benefit some creditors at the expense of others. With respect to these issues, therefore, bankruptcy law should be understood as governing the activity of creditors *inter se.* The Debtor, in this analysis, is not the central focus.

Creditor remedies outside of bankruptcy ... can be accurately described as a species of 'grab law,' represented by the key characteristic of first-come, first-served. The creditor first staking a claim to particular assets of the debtor generally is entitled to be paid first out of those assets.[10]

The basic problem that bankruptcy law is designed to handle, both as a normative matter and as a positive matter, is that the system of individual creditor remedies may be bad for the creditors *as a group* when there are not enough assets to go around. Because creditors have conflicting rights, there is a tendency in their debt-collection efforts to make a bad situation worse. Bankruptcy law responds to this problem.[11]

The grab rules of nonbankruptcy law and their allocation of assets on the basis of first-come, first-served create an incentive on the part of individual creditors, when they sense that a debtor may have more liabilities than assets, to get in line today (by, for example, getting a sheriff to execute on the debtor's equipment), because if they do not, they run the risk of getting nothing. This decision by numerous individual creditors, however, may be the wrong decision for the creditors as a group ... Bankruptcy provides a way to make these diverse individuals act as one, by imposing a *collective* and *compulsory* proceeding on them.[12]

In defining the statutory requirements that govern actions to avoid inequities result-

5. Newman contends that FIBSA was solvent on June 2, 1998. The only evidence in support of that contention is that the Debtor's bankruptcy schedules indicate that the Debtor was solvent on the date of the bankruptcy filing. Those schedules are obviously incorrect since they list the collateral as an asset of the estate.

6. Includes the Collateral worth $50,000 (Debtor's Schedule A and stipulation of the parties) plus the Debtor's personal property of $17,500 (Debtor's Schedule B and the stipulation of the parties).

7. Includes the Bank claim of $19,500 plus Schedule E Unsecured Priority Claims of $23,670.72, plus Schedule F unsecured non-priority claims of $21,203.44.

8. Debtor's bankruptcy Schedule B.

9. Includes Schedule E Unsecured Priority Claims of $23,670.72, plus Schedule F unsecured non-priority claims of $21,203.44.

10. Jackson, Thomas H., *The Logic and Limits of Bankruptcy Law*, 1986, Harvard University Press, page 8.

11. *Id.,* page 10.

12. *Id.,* page 12. The lengthy discussion by Dean Jackson concerning the "common pool" concept is omitted. The thrust of that discussion, however, is that the "grab" rules of state collection laws may allow one creditor to be paid in full while others go unpaid, but a collective "pool" collection effort (such as bankruptcy) can provide more assets to more creditors while still respecting lien and other priorities.

ing from "grab law," the bankruptcy code has required proof of seven elements. The Court concludes that although Congressional *policy* would appear to authorize avoidance of the foreclosure in this case, such an action cannot succeed in this case because two of the requisite elements of the Bankruptcy Code are not present.

*TRANSFER MADE WHILE THE DEBTOR WAS INSOLVENT*

One of the requirements of § 547 is that the transfer must have been "... made *while* the debtor was insolvent." [Emphasis supplied.] The Court has been unable to locate any authority determining whether this test is met if the debtor becomes insolvent as a consequence of the transfer.

Bankruptcy Code § 548 (dealing with fraudulent transfers) addresses the problem. That section provides that the transaction can be avoided if the debtor "... was insolvent on the date that such transfer was made ... or became insolvent as a result of such transfer ...". Because the language of § 547 is different, the Court assumes that Congress meant something different from what it articulated so clearly in § 548. The Court also looks to the general meaning of "while" as used in everyday parlance. The Court concludes that the word "while," as used in these circumstances, means that insolvency must have existed both before and after the foreclosure. The Court interprets § 547 to require that the debtor was insolvent both before and after the transaction, and therefore the foreclosure occurred "while" the debtor was insolvent.

■ Under this interpretation, the fifth required element of § 547 is not met. The transfer was not made "while" the debtor was insolvent because the Debtor was not insolvent both before and after the transfer.

*THE TRANSFER ALLOWED THE CREDITOR TO RECEIVE MORE THAN THE CREDITOR WOULD HAVE RECEIVED IN A CHAPTER 7.*

■ Tension is created by this transaction because if the foreclosure is allowed to stand, (i) the Bank will have received and will retain more money than it was due on its loan and (ii) the Bank will achieve this windfall at the expense of unsecured creditors who will go unpaid. In addition, a real estate speculator will have obtained a bargain purchase while federal taxes are unpaid. By contrast, if the transaction were avoided, all creditors would be paid in full and some funds might even be left over for the Debtor.

Nevertheless, regardless of this same potential inequity, the United States Supreme Court has held that the purchase price received in a regularly conducted, noncollusive foreclosure sale is deemed to be reasonably equivalent value and therefore is not a fraudulent transfer avoidable under Bankruptcy Code § 548. *BFP v. Resolution Trust Corporation,* 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994).

The *BFP* decision is not directly on point because in *BFP* the Supreme Court dealt the term "reasonably equivalent value" in Bankruptcy Code § 548. This Court did not address Bankruptcy Code § 547. Bankruptcy Code § 548 allows the trustee to avoid a transfer that was made for less than reasonably equivalent value. The Supreme Court, by a 5–4 decision, held that the price received at a noncollusive, properly conducted foreclosure sale is deemed, as a matter of law, to be reasonably equivalent value. The term "reasonably equivalent value" is not included in § 547. The question under § 547 is whether the creditor received more than the creditor would have received in a chapter 7 liquidation.

A reasonable businessman or businesswoman would no doubt conclude that the Bank received more in this foreclosure than it would have received in a chapter 7 liquidation. In chapter 7 the Bank would have received $19,500. In this transaction the Bank received $27,250. The comparison and the answer are not difficult.

The only appellate decision directly on point holds that this simple arithmatic does not satisfy the seventh element of Bankruptcy Code § 547. The factual basis in *Ehring v. Western Moneycenter (In re Ehring),* 900 F.2d 184 (9th Cir.1990) is virtually identical to the instant case. In *Ehring* the secured creditor foreclosed and immediately resold the collateral at a profit. The circuit court

held that the bank's profit was not received in its capacity *qua* creditor, but was received in its capacity *qua* purchaser at foreclosure sale.[13]

This analysis seems strained. The circuit court ignored the value of the collateral that the bank received at foreclosure. The Court focused instead on the sale of that collateral by the bank as the relevant event for measuring what the creditor received. The Internal Revenue Code and tax jurisprudence expend significant effort to determine the moment when a profit is realized, and when it is recognized. That analysis is important in tax law because taxes are computed in annual periods and one must determine *which* period is chargeable with the gain or loss. But that type of analysis does not have the same significance in bankruptcy law. No reasonable businessperson would doubt that if the bank got a piece of property worth $50,000, then the bank received more than it was due on a $19,500 debt. There would seem to be no requirement in bankruptcy law to defer the recognition of value until the collateral is converted to cash. Nevertheless, the law at present is to the contrary.

Several bankruptcy courts have addressed the issue and a district court has addressed the issue as well.

1. In *Winters v. First Union National Bank of Florida*, 119 B.R. 283 (Bankr.

M.D.Fla.1990) the court held that a preferential transfer existed when the defendant purchased collateral for $14,284.26 at a foreclosure sale and then sold the property for $30,000. This decision, however, was based equally on the court's conclusion that the transaction was a fraudulent transfer under Bankruptcy Code § 548.

This case was decided before the Supreme Court decision in *BFP* and one cannot tell whether that decision would have altered the decision with respect to § 547.

*See also In re Smith*, 21 B.R. 345 (Bankr.M.D.Fla.1982).

2. In *First Federal Savings & Loan Association of Warner Robbins v. Standard Building Associates, Ltd.* 87 B.R. 221 (N.D.Ga.1988), the district court held that the foreclosure sale was avoidable as a fraudulent transfer under Bankruptcy Code § 548. In dicta, the Court held that § 547 can never apply to a judicial foreclosure because "conceptually" a foreclosure does not fall within the concept of a preference. In this analysis, in order to receive a preference the creditor must be an unsecured creditor because secured

---

**13.** "If the creditor received 'more' it is only because the creditor elected to purchase the property at the foreclosure sale rather than simply accepting the receipts of a sale to a third party. Had the third party outbid the creditor, there could be no preference because the price paid would not have been transferred for an antecedent debt. Since § 547 does not reach a third-party purchaser, it is difficult to see why the existence of a preference should turn on the status of the purchaser as a creditor. If the sale was defective or the purchaser otherwise took unfair advantage of the debtor, the transfer may be voided under § 548, regardless of whether the purchaser was the creditor or a third party. We see no reason to construe § 547 to permit avoidance of an otherwise properly conducted sale based solely on the creditor being the highest bidder. Furthermore, a close analysis of a foreclosure proceeding supports treating the creditor the same as the third-party buyer. Foreclosure is not a unitary event, but in fact two separate legal events. First, the creditor must exert its

power or right to foreclose—to force the sale of the property. The creditor has no obligation to buy, let alone, bid at the sale. Moreover, the creditor in purchasing the property at the foreclosure sale assumes the risk of not being able to dispose of it for the amount of the debt. The sale is a separate, second transaction, the receipts of which will be used to satisfy the creditor. A preference exists only when the creditor has received more under the foreclosure than it would have under Chapter 7 liquidation. There is nothing in the statute that prohibits the creditor from purchasing the property in a liquidation sale—just as at foreclosure. In fact, § 547(b)(5) likely presumes a liquidation sale similar to the foreclosure sale forced by the mortgagee. See 2 J. White & R. Summers, Uniform Commercial Code § 25–7, at 450. We conclude therefore that a creditor who purchases at a regularly conducted foreclosure sale has not received more than it would have under a Chapter 7 liquidation sale." *In re Ehring*, 900 F.2d 184, 189. See also *Young v. Washington Federal Savings & Loan*

**340**

creditors do not receive a distributive portion of the bankruptcy estate.[14]

The conclusion in this case certainly fits within the way that preferences are colloquially discussed, but it does not follow the language of the statute. In addition, one might remember that this language is *dicta*. Finally, the decision was issued pre-*BFP* and followed *Durrett v. Washington National Insurance Co.*, 621 F.2d 201 (5th Cir.1980) which was overruled in *BFP*. It is not clear how much continuing vitality this case has.

3. In *Federal National Mortgage Association v. Wheeler*, 34 B.R. 818 (Bankr. N.D.Ala.1983) the court held, that a foreclosure was a preferential transfer when the other elements of § 547 were met and when the creditor received collateral worth more than the amount of the debt.

However, this decision also held that the transfer was a fraudulent transfer. Therefore, the reference to § 547 could be considered dicta. In addition, this decision was also rendered pre-*BFP* and has questionable continuing vitality.

4. *Cottrell v. U.S.*, 213 B.R. 378 (Bkrtcy. M.D.Ala.1996) is the only case that discusses the issue after the Supreme Court decision in *BFP*. *Cottrell* holds as a matter of law, that the foreclosure sale price establishes the price that a chapter 7 trustee would realize on a sale in a bankruptcy context.[15] Therefore, the court in *Cottrell* holds, as a matter of law, that the creditor could not have received more through a pre-bankruptcy foreclosure.

That may be a rule of law, but it is not a reflection of fact. This Court has frequently seen property bring a higher price than what is offered by the lien creditor, if the property is marketed by a trustee, with a reasonable period allowed for marketing through a real estate agent and multiple listing service.

Nevertheless, the *Cottrell* case addresses the most serious obstacle to classification of this foreclosure as a preferential transfer. Although the Supreme Court decision in *BFP* is not directly on point, it nevertheless controls this decision because its principal rationale is applicable. In *BFP* the Supreme Court held that "reasonably equivalent value" could not be determined by reference to "fair market value" because to do so would "disrupt the harmony of foreclosure law and fraudulent transfer law." The Court simply held that real property titles were an important element of state law that could not be impinged by federal bankruptcy law without clear textual guidance.

Surely Congress has the power pursuant to its constitutional grant of authority over bankruptcy, U.S. Const., Art. I, § 8, cl. 4, to disrupt the ancient harmony that foreclosure law and fraudulent conveyance law, those two pillars of debtor-creditor jurisprudence, have heretofore enjoyed. But absent clearer textual guidance than the phrase "reasonably equivalent value"—a phrase entirely compatible with pre-existing practice—we will not presume such a radical departure.[16]

Federal statutes impinging upon important state interests "cannot ... be construed without regard to the implications of our dual system of government.... [W]hen the Federal Government takes over ... local radiations in the vast network of our national economic enterprise and thereby radically readjusts the balance of state and national authority, those charged with the

---

*Assoc. (In re Young)*, 156 B.R. 282 (Bankr.D.Idaho 1993).

**14.** "... [W]hile the literal language of § 547 seems to apply to transactions such as nonjudicial foreclosures, conceptually a foreclosure does not fit within the 'preference' category. The preference provision applies to those creditors who by virtue of a pre-petition transfer receive more than they would under the distributive provisions of the bankruptcy code. Fully secured mortgage holders are not entitled to anything under the 'distributive provisions' of the bankruptcy code, precisely because they have liens covering specific assets. Thus, § 547 does not apply to validly executed nonjudicial foreclosures." 87 B.R. 221, 224.

**15.** "In this case the value at foreclosure by RHS establishes the 'forced sale' price, a price which would undoubtedly be duplicated by a trustee in a 'forced sale' in bankruptcy." *Cottrell v. U.S.*, 213 B.R. 378 (Bkrtcy.M.D.Ala.1996).

**16.** *BFP v. Resolution Trust Corporation*, 511 U.S. 531, 543, 114 S.Ct. 1757, 1764, 128 L.Ed.2d 556 (1994).

duty of legislating [must be] reasonably explicit." Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.Rev. 527, 539–540 (1947), quoted in *Kelly v. Robinson,* 479 U.S. 36, 49–50, n. 11, 107 S.Ct. 353, 360–362, n. 11, 93 L.Ed.2d 216 (1986). It is beyond question that an essential state interest is at issue here: We have said that "the general welfare of society is involved in the security of the titles to real estate" and the power to ensure that security "inheres in the very nature of [state] government." *American Land Co. v. Zeiss,* 219 U.S. 47, 60, 31 S.Ct. 200, 204, 55 L.Ed. 82 (1911). Nor is there any doubt that the interpretation urged by petitioner would have a profound effect upon that interest: The title of every piece of realty purchased at foreclosure would be under a federally created cloud. (Already, title insurers have reacted to the *Durrett* rule by including specially crafted exceptions from coverage in many policies issued for properties purchased at foreclosure sales. See, e.g., L. Cherkis & L. King, Collier Real Estate Transactions and the Bankruptcy Code, pp. 5–18 to 5–19 (1992).) To displace traditional state regulation in such a manner, the federal statutory purpose must be "clear and manifest," *English v. General Elec. Co.,* 496 U.S. 72, 79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990).[17]

In *BFP,* as a matter of federalism, the Supreme Court decided to prefer state title interests over the "basic principle" of bankruptcy law as discussed earlier in this opinion. This Court considers itself bound by that decision of the Supreme Court. To hold this foreclosure to be a preferential transfer would create the same problems with state real property title records that would have been created by classifying the transaction as a fraudulent transfer. Bankruptcy Code § 547 is no more "clear and manifest" to that end than Bankruptcy Code § 548.

The apparent lesson of *BFP* is that if a creditor is oversecured, the Debtor must file a bankruptcy petition (or creditors must file

an involuntary petition) before foreclosure to prevent the secured creditor from reaping a windfall at the expense of other creditors. If the Debtor does not do so, there would appear to be no protection for unsecured creditors who do not have knowledge of the foreclosure in time to file an involuntary petition.

Therefore, by separate order issued this date, summary judgment is awarded in favor of Plaintiff.

---

**17.** *BFP v. Resolution Trust Corporation,* 511 U.S. 531, 544 114 S.Ct. 1757, 1764, 128 L.Ed.2d 556 (1994).