In re Walter Steven RAMBO, Debtor.

**Walter Steven Rambo and Edward Sparkman, Plaintiffs,**

v.

**Chase Manhattan Mortgage Corporation, Defendant.**

**Bankruptcy No. 02–35226DWS.**

**Adversary No. 02–1374.**

United States Bankruptcy Court, E.D. Pennsylvania.

July 31, 2003.

David A. Scholl, Newtown Square, PA, Counsel for Plaintiffs.

Michael J. Barrie, Schnader, Harrison, Segal & Lewis, LLP, Philadelphia, PA, Counsel for Defendant.

Edward Sparkman, Philadelphia, PA, for Chapter 13 Trustee.

Dave P. Adams, Office of the U.S. Trustee, Philadelphia, PA, for United States Trustee.

### OPINION

DIANE WEISS SIGMUND, Bankruptcy Judge.

Before the Court is the motion ("Motion") by defendant, Chase Manhattan Mortgage Corporation ("Chase"), for summary judgment on the complaint ("Complaint") which plaintiffs, Walter Steven Rambo ("Debtor"), and the Standing Chapter 13 Trustee, Edward Sparkman ("Trustee")[1] filed against it.[2] Chase,

---

1. The Trustee is a nominal plaintiff and has taken no position with regard to the Motion.

2. The Motion was originally filed as a motion to dismiss. However, at the hearing on this matter, the parties agreed to have this matter handled as a motion for summary judgment should Chase opt within a specified time period to file an affidavit supporting its position which it did. Plaintiffs were granted the opportunity to reply to Chase's affidavit which they did with an affidavit and a supplemental memorandum. Consequently, I shall treat Chase's motion to dismiss as a motion for

which held a mortgage on the residence ("Residence") owned by Debtor and his wife, purchased the Residence at a Sheriff's sale before Debtor filed his current bankruptcy case. The Complaint seeks to have the sale of the Residence to Chase set aside as a preference under 11 U.S.C. § 547(b). After Chase filed its submissions relating to the Motion, Debtor filed an amended complaint ("Amended Complaint") pursuant to F.R.Civ.P. 15 which is made applicable hereto by F.R.Bank.P. 7015.[3] The Amended Complaint supersedes the original Complaint. Because the issues raised in the Motion are not rendered moot by the Amended Complaint, I shall consider the Motion as being directed to the Amended Complaint. *See* 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1476, at 558 (reasoning that a defendant should not be required to file a new motion to dismiss simply because an amended pleading was introduced while its motion was pending but rather if some of the "defects raised in the original motion remain in the new pleading, the court simply may consider the motion as being addressed to the amended pleading."). Upon consideration, I grant the Motion for the reasons set forth below.

## BACKGROUND

On June 14, 1999, Debtor and his wife, Diane J. Rambo ("Ms. Rambo") (Debtor and Ms. Rambo are collectively referred to as the "Mortgagors"), granted a mortgage on their Residence to Irwin Mortgage Corp. d/b/a Inland Mortgage ("IMC"). Affidavit of Eileen Lare dated April 2, 2003 ("Lare Affidavit") ¶ 3. The Mortgage secured the Mortgagors' obligation to repay a note dated June 13, 1999 for the principal amount of $199,450.00. *Id.* ¶ 4. IMC subsequently assigned the Mortgage to Chase. *Id.* ¶ 5.

On September 8, 2000, Ms. Rambo filed for a divorce but no final divorce decree has been entered. *Id.* ¶ 8. No payments have been made on the Note and Mortgage since May 1, 2001. *Id.* ¶ 6.

On October 15, 2001, Chase filed a mortgage foreclosure action against the Mortgagors in state court. *Id.* ¶ 7. Seven months later, on May 15, 2002, the state court granted Chase's motion for summary judgment in the foreclosure action, entering an in rem judgment against Debtor for "$208,824.26 plus interest from September 1, 2001 at the rate of $41.68 per diem and other costs and charges collectible under the mortgage, for foreclosure and sale of the mortgaged property." Lare Affidavit ¶ 7 and Exhibit F thereto.

The Residence was listed for public sale on July 24, 2002. Lare Affidavit ¶ 11. On June 5, 2002, the Prothonotary for the state court assessed damages in the amount of $219,536.02, as itemized on a Praecipe for Assessment of Damages

summary judgment. Fed.R.Civ.P. 12(b)(incorporated here by Fed.R.Bankr.P. 7012.)

**3.** Rule 15 permits a party to "amend the party's pleading once as a matter of course at any time before a responsive pleading is served[.]" F.R.Civ.P. 15. Since neither a motion to dismiss nor a motion for summary judgment constitutes a responsive pleading, Plaintiffs were entitled " 'as a matter of course' " to amend their Complaint. *Centifanti v. Nix,* 865 F.2d 1422, 1431 n. 9 (3d Cir.1989). *See also Jurgevich v. McGary,* 63

Fed.Appx. 448, 451 (10th Cir.2003) ("A motion for summary judgment, like a motion to dismiss, is not considered to be a 'responsive pleading' and therefore does not cut off a plaintiff's right to amend without leave of court.").

The material change from the Complaint which alleged value in the Residence of "at least $250,000" to the Amended Complaint is the superceded averment that the Residence's value is $299,000.

which Chase submitted. Lare Affidavit ¶ 12 and Exhibit H thereto.

On July 22, 2002, on the eve of a scheduled Sheriff's sale of the Residence, Debtor filed a Chapter 13 bankruptcy case which stayed the sale. Lare Affidavit ¶ 13. The Sheriff's sale of the Residence was postponed by oral announcement until October 23, 2002. *Id.* ¶ 14. However, Debtor's bankruptcy case was subsequently dismissed because Debtor failed to timely file his Schedules, and on October 23, 2002, the scheduled Sheriff's sale took place. *Id.* ¶¶ 15, 16. Chase was the successful bidder at the sale, bidding $220,000.00 for the Residence. *Id.* ¶ 16. Costs of the Sheriff's sale totaled $7,378.32. *Id.* ¶ 20 and Exhibit L thereto. On the day after the Sheriff's sale, October 24, 2002, Chase assigned its bid to the Federal National Mortgage Association. Lare Affidavit ¶ 18. On October 25, 2002, Debtor filed the instant bankruptcy case under Chapter 13 of the Bankruptcy Code,[4] *id.* ¶ 19, and shortly thereafter commenced this adversary proceeding to recover the foreclosed Residence in which he claims an exemption of $17,425.00 pursuant to 11 U.S.C. § 522(d)(1). Schedule C to Schedules. Doc. No. 11.[5]

In the Amended Complaint, Plaintiffs allege that the "value" of the Residence "at present is $299,000." Amended Complaint ¶ 10. The allegation is supported by the Affidavit of Elizabeth Turella ("Turella") dated April 10, 2003, a real estate agent for over 20 years currently employed by Real Estate Excel in Perkasie, Pennsylvania, who opines that the "fair market value" of the Residence is $299,000.00.[6] *Id.*

## DISCUSSION

As noted above, Plaintiffs seek to have the foreclosure sale of the Residence to Chase avoided as a preference under 11 U.S.C. § 547(b). This statutory provision provides, in pertinent part:

---

4. I shall take judicial notice of the docket entries in Debtor's bankruptcy case pursuant to Fed.R.Evid. 201, incorporated in these proceedings by F.R.Bankr.P. 9017. *See Maritime Elec. Co., Inc. v. United Jersey Bank,* 959 F.2d 1194, 1200 n. 3 (3d Cir.1991); *Levine v. Egidi,* 1993 WL 69146, at *2 (N.D.Ill.1993); *In re Paolino,* 1991 WL 284107, at *12 n. 19 (Bankr.E.D.Pa.1991); *see generally In re Indian Palms Associates, Ltd.,* 61 F.3d 197 (3d Cir.1995).

5. While a court may not take judicial notice *sua sponte* of facts contained in the debtor's file that are disputed, *In re Aughenbaugh,* 125 F.2d 887 (3d Cir.1942), it may take judicial notice of adjudicative facts "not subject to reasonable dispute ... [and] so long as it is not unfair to a party to do so and does not undermine the trial court's factfinding authority." *In re Indian Palms Assoc.,* 61 F.3d 197, 205 (3d Cir.1995) (*citing* Fed.R.Evid. 201(f) advisory committee note (1972 proposed rules)).

6. On Schedule A of Debtor's Schedules and in the Chapter 13 liquidation analysis which supports his Chapter 13 plan, he listed the current market value of the Residence, owned as a tenancy by the entirety, as $265,0000.00. In opposition to the Motion, Debtor has now submitted evidence asserting a higher market value for the Residence. *See* Affidavit of Turella. He is not precluded from so doing since an admission in a schedule may be sought to be corrected. *See also Boggess v. Boggess (In re Boggess),* 105 B.R. 470, 474 (Bankr.S.D.Ill.1989) (ruling that the "estimated value [for their home] used by debtors in preparing their bankruptcy schedules" was not binding on the debtors "in determining the value of the property for purposes of their motion to avoid lien" since an "admission in schedule filed in bankruptcy proceeding, like other admissions, may be corrected or explained by debtor and is not *res judicata* either as to creditors or the debtor."). Chase has provided no evidence of fair market value consistent with its view that valuation under that standard is not dispositive here.

[T]he trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; ...and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title[.]

11 U.S.C. § 547(b).

There is no dispute that the foreclosure sale of the Premises was a transfer of an interest of the debtor in property for the benefit of Chase during the ninety day period prior to the bankruptcy filing. *BFP v. Resolution Trust Corporation,* 511 U.S. 531, 535 & n. 7, 114 S.Ct. 1757, 1760 & n. 7, 128 L.Ed.2d 556 (1994) (*citing* 11 U.S.C. § 101(54)). Nor does Chase present an evidentiary challenge to the presumption that Debtor was insolvent on and during the ninety days immediately preceding the filing.[7] 11 U.S.C. § 547(f). Rather the

thrust of its case is that § 547(b)(5) cannot be satisfied as a matter of law and fact. In support of this position and its request for summary judgment, Chase raises three major arguments. First, Chase contends that the holding and rationale in *BFP v. Resolution Trust Corporation, supra,* compels this Court to conclude that 11 U.S.C. § 547(b) cannot serve as a basis to avoid non-collusive foreclosure sales conducted in accordance with state foreclosure law. Next and related to the first argument, Chase argues that Plaintiffs cannot prevail under § 547(b) because it cannot satisfy the requirement of § 547(b)(5), namely that the sale of the Residence to Chase permitted it to receive more that it would receive in a Chapter 7 liquidation if the sale had not taken place, because the foreclosure sale price of $220,000 should be utilized rather than the "fair market value." Lastly, Chase asserts that there can be no preference under § 547(b) because, in this case, setting aside the Sheriff's Sale "will in no way inure to the benefit of the Plaintiff's unsecured creditors." I address each of these arguments below.

### I.

Prior to the Supreme Court's decision in *BFP,* a number of bankruptcy courts had interpreted what they viewed as the plain language of § 547(b)(5) to conclude that an oversecured creditor that purchased its collateral at a sheriff's sale by bidding its debt received a preference under § 547.[8] *See, e.g., Park North Part-*

---

7. Chase argues that the Amended Complaint fails to state a claim because Plaintiffs failed to allege that Debtor was insolvent at the time of the foreclosure sale. However, Plaintiffs do allege that "[t]he sale of the [Residence] constitute a transfer of same, for the benefit of the Defendant, on account of an antecedent debt while Debtor was insolvent[.]" Amended Complaint ¶ 14.

8. Typically the requirements of § 547(b)(5) cannot be met as to a secured creditor since the transfer involves a return of its collateral which it would be entitled to receive in a Chapter 7 case. Thus, it will not have received more than it would receive in a Chapter 7 case if the transfer had not been made. *See, e.g., In re Villamont–Oxford Associates, L.P.,* 236 B.R. 467, 477–78 (Bankr.M.D.Fla.1999); *In re Union Meeting Partners,* 163 B.R. 229,

*ners Ltd. v. Park North Associates (In re Park North Partners, Ltd).*, 80 B.R. 551 (N.D.Ga.1987); [9] *Winters v. First National Bank of Florida (In re Winters)*, 119 B.R. 283 (Bankr.M.D.Fla.1990); *Federal National Mortgage Ass'n v. Wheeler (In re Wheeler)*, 34 B.R. 818 (Bankr.N.D.Ala. 1983); *Morris Plan Company v. Fountain (In re Fountain)*, 32 B.R. 965 (Bankr. W.D.Mo.1983). For these courts, the analysis was straight forward. It compared the amount of the secured creditor's mortgage debt plus its costs of foreclosure with the fair market value of the real estate as of the date of the filing. If the property value was greater, then the creditor received more than it would have received in a Chapter 7 liquidation and that excess

was recoverable for the estate as a preference. The assumption made by these courts was that the value received by the creditor which had recovered the real estate was its fair market value. The judicial landscape, however, changed with the Supreme Court's decision in *BFP*.[10]

In *BFP, supra*, a third party purchased real property at a pre-petition foreclosure sale that was conducted in accordance with state law. The property was sold for $433,000, but had a fair market value of $725,000. After filing for bankruptcy, the debtor sought to set aside the conveyance of the property on the grounds that the foreclosure sale constituted a fraudulent transfer under § 548 of the Bankruptcy Code.[11] The issue before the Supreme

236–37 (Bankr.E.D.Pa.1994). This case posits a variant of that scenario, *i.e.*, where the value of the collateral is greater than the creditor's claim.

**9.** The *Park North Partners* district court disagreed with the bankruptcy court's holding to the contrary and remanded so the bankruptcy court could fix market value to determine whether the creditor had received more that its secured claim. The bankruptcy court did so but used the opportunity of its opinion to elucidate on its disagreement with the district court's opinion. *Park North Partners Ltd. v. Park North Associates (In re Park North Partners, Ltd.)*, 85 B.R. 916 (Bankr.N.D.Ga.1988). The bankruptcy court opined that a foreclosure sale can never be a preference because it is not the type of transfer Congress intended to be recaptured by § 547. The court gave two statutory bases for its conclusion. First, it stated that as no provision is made for distributions to secured creditors under Code §§ 726 and 507, a secured creditor receives no distribution under Chapter 7 and accordingly § 547(b)(5) is simply inapplicable. Second, it stated that there was no transfer "for or on account of an antecedent debt" as the debt was satisfied in full. It reasoned that the surplus was being sought to be recaptured and that was not a transfer on account of an antecedent debt but rather a "windfall" which could be recovered, if at all, under fraudulent conveyance law. I find both of these argu-

ments unconvincing. The court's statement that a secured creditor does not receive a distribution in Chapter 7 is not only contrary to what actually happens in Chapter 7 cases when the Chapter 7 trustee sells liened assets but what the Code provides. Section 725 specifically authorizes the Chapter 7 trustee to dispose of secured property and § 326(a) allows her to receive a commission on disbursements to a secured creditor. I also find no support for the court's artificial bifurcation of the transfer into debt repayment and windfall components. Finally, the court expressed the concern that animates *BFP* and the foreclosure preference cases that have followed it, *i.e.*, the grave ramifications on the state system of real property foreclosures if such sales could be set aside under bankruptcy law. I discuss the policy implications below.

**10.** Debtor relies on these cases contending that they have vitality after *BFP*. For the reasons that follow, I respectfully disagree.

**11.** To establish a fraudulent conveyance under § 548, the following elements must be established: "(1) that the debtor had an interest in property; (2) that a transfer of that interest occurred within one year of the filing of the bankruptcy petition; (3) that the debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) that the debtor received 'less than a reasonably equivalent value in exchange for such

Court was whether the price paid for the property at the foreclosure sale was the "reasonably equivalent value" of the property transferred. In addressing this issue, the Supreme Court reasoned, in a 5–4 decision, that the language of § 548(a) that a debtor must have received less than a reasonably equivalent value in exchange for the property transferred is straightforward in that it directs "an inquiry into the relationship of the value received by the debtor to the worth of the property transferred" but ambiguous in that it fails to answer the question "what is a foreclosed property worth?" *Id.* at 546–47, 114 S.Ct at 1766. The Supreme Court identified three possible answers to this question: (i) fair market value; (ii) reasonable forced-sale price; and (iii) the foreclosure-sale price itself.[12]

The Supreme Court soundly rejected the notion that "fair market value" should be used in determining whether reasonably equivalent value was received. In doing so, the Supreme Court observed that Congress chose not to use the term "fair market value" in § 548 even though it had used the phrase in other sections of the Bankruptcy Code but opted instead to use the "entirely novel phrase 'reasonably equivalent value.'" *Id.* at 537, 114 S.Ct. at 1761. The Supreme Court reasoned that Congress' choice of phrase was intentional because market value "has no applicability

in the forced-sale context[.]" *Id.* at 537–39, 114 S.Ct. at 1761–62. Expounding on this point, the Supreme Court stated:

> The language of § 548(a)(2)(A) ("received less than a reasonably equivalent value in exchange") requires judicial inquiry into whether the foreclosed property was sold for a price that approximated its worth at the time of sale. An appraiser's reconstruction of "fair market value" could show what similar property would be worth if it did not have to be sold within the time and manner strictures of state-prescribed foreclosure. But property that must be sold within those strictures is simply worth less. No one would pay as much to own such property as he would pay to own real estate that could be sold at leisure and pursuant to normal marketing techniques.

*Id.* at 539, 114 S.Ct at 1762.

The Supreme Court next rejected the view that a reasonable forced-sale price should be used in determining whether "reasonably equivalent" value was obtained. *Id.* at 540, 114 S.Ct at 1762–63. The Supreme Court opined that "to specify a federal 'reasonable' foreclosure-sale price" such as 70% of the fair market value would "extend federal bankruptcy law well beyond the traditional field of fraudulent

---

transfer.' 11 U.S.C. § 548(a)(2)(A)." *BFP, supra,* 511 U.S. at 535, 114 S.Ct at 1760. The focus in *BFP* was on the last element.

**12.** While certain sections of the Code are specific as to the measure of value to be applied, many are not. The legislative history of § 506 which requires valuation to determine secured status reflects Congress' intention to leave to the court the appropriate valuation standard.

> While courts will have to determine value on a case-by-case basis, the subsection makes clear that valuation is to be determined in light of the purpose of the valua-

tion and the proposed disposition of use of the subject property.

S. Rep. No. 989, 95th Cong., 2d Sess 68 (1978), U.S.Code Cong. & Admin.News 1978, 5787, 5854.

> "Value" does not necessarily contemplate forced sale or liquidation value of the collateral; nor does it always imply a full going concern value. Courts will have to determine the value on a case-by-case basis, taking into account the facts of each case and the competing interests in the case.

H.R.Rep. No. 595, 95th Cong., 1st Sess 356 (1977), U.S.Code Cong. & Admin.News 1978, 5963, 6312.

transfers, into realms of policy where it has not ventured before." *Id.* Seeking to provide an historical background to substantiate this conclusion, the Supreme Court reviewed the development of fraudulent transfer and foreclosure law.

The Supreme Court described the development of strict foreclosures and foreclosures by sale, explaining that since these developments occurred, "the States have created diverse networks of judicially and legislatively crafted rules governing the foreclosure process, to achieve what each of them considers the proper balance between the needs of lenders and borrowers." *Id.* at 541–42, 114 S.Ct. at 1763. The Supreme Court observed that when state-imposed procedures for foreclosure are followed, "it is 'black letter' law that mere inadequacy of the foreclosure sale price is no basis for setting the sale aside, though it may be set aside (*under state foreclosure law*, rather than fraudulent transfer law) if the price is so low as to 'shock the conscience or raise a presumption of fraud or unfairness.'" *Id.* at 542, 114 S.Ct. at 1763–64 (emphasis in original) (*quoting* G. Osbourne, G. Nelson & D. Whitman, Real Estate Finance Law 9, 469, (1979)). Reasoning that fraudulent transfer law and foreclosure law have "enjoyed over 400 years of peaceful coexistence" and that the phrase "reasonably equivalent value" is "entirely compatible with pre-existing practice," the Supreme Court concluded that, "absent clearer textual guidance," the phrase should be interpreted as being consistent with existing law rather than as creating a radical departure from it. *Id.* at 543, 114 S.Ct. at 1764. It observed that federal statutes cannot be construed without regard for the implications of the dual system of government. Elaborating on this point, the Supreme Court declared:

It is beyond question that an essential state interest is at issue here: We have said that the "general welfare of society is involved in the security of the titles to real estate" and the power to ensure that security "inheres in the very nature of [state] government." Nor is there any doubt that the interpretation urged by petitioner would have a profound effect upon that interest: The title of every piece of realty purchased at foreclosure would be under a federally created cloud. . . . To displace traditional state regulation in such a manner, the federal statutory purpose must be "clear and manifest[.]" Otherwise the Bankruptcy Code will be construed to adopt, rather than displace, pre-existing law.

*Id.* at 544–45, 114 S.Ct. at 1764–65. (citations omitted).

Having rejected the notion that "reasonably equivalent value" in its application to mortgage foreclosures means "fair market value" or a "reasonable forced-sale price" and having concluded that the phrase "reasonably equivalent" could be interpreted consistent with state foreclosure law to preserve the states' interest in the stability of title, the Supreme Court ruled that "reasonably equivalent value" for foreclosed property "is the price in fact received at the foreclosure sale, so long as all the requirements of the State's foreclosure law have been complied with." *Id.* at 545, 114 S.Ct. at 1765. In so holding, the Supreme Court insulated regularly conducted foreclosure sales from attack under fraudulent conveyance law. Chase now argues that a similar result should obtain when a regularly conducted foreclosure sale is challenged as a preferential transfer because "Congressional intent to override state foreclosure law and the essential state interest regarding real property title is no more 'clear' or 'manifest'" under § 547 than it is under § 548. Memorandum of Law in Support of the Motion of Defendant Chase Manhattan Mortgage Corpora-

tion to Dismiss the Complaint for Failure to State a Claim Upon Which Relief Can Be Granted ("Chase Memorandum") at 7. Accordingly, Chase would have me find as a matter of law that § 547 may not be utilized to avoid a regularly conducted sheriff's sale.

 Several bankruptcy courts have adopted Chase's rationale, concluding that they are bound by the Supreme Court to reject preference claims to set aside foreclosure sales based on the strong policy underpinnings of *BFP* which they conclude have equal force whether the sale is being attacked as a fraudulent conveyance or preference. *Chase Manhattan Bank v. Pulcini (In re Pulcini)*, 261 B.R. 836 (Bankr.W.D.Pa.2001); *Newman v. FIBSA Forwarding, Inc. (In re FIBSA Forward-*

*ing, Inc.)*, 230 B.R. 334 (Bankr.S.D.Tex.), *aff'd*, 244 B.R. 94 (S.D.Tex.1999).[13] They have done so even assuming the fair market value as evidenced by appraisal or subsequent sale was greater than the amount paid by the creditor at the sheriff's sale. *Pulcini*, 261 B.R. at 844; *FIBSA Forwarding*, 230 B.R. at 341.[14] Thus, the Supreme Court's recognition of the states' important interest in controlling the laws governing the foreclosure of real property have been imported from the fraudulent conveyance context to preference cases, but without discussion of the statutory predicate, *i.e.*, § 547(b)(5). Whether the value determination under a different provision of the Bankruptcy Code should follow the *BFP* value determination requires an analysis first of the statute, not the policies that would support it.[15] Because it

---

13. The *Pulcini* court concluded that setting aside a sheriff's sale as a preference would "profoundly affect Pennsylvania's interest in making title to real property stable and secure" because "[t]itle to real property purchased at a foreclosure sale 'would be under a federally created cloud,'" *id. (quoting BFP, supra*, 511 U.S. at 544, 114 S.Ct. 1757), and that when Congress enacted § 547(b), it did not evince a "clear and manifest" intent to "override the long-standing law of Pennsylvania concerning title to real property." *Id.* at 844–45, 114 S.Ct. 1757. *FIBSA Forwarding* stated likewise that:

In *BFP*, as a matter of federalism, the Supreme Court decided to prefer state title interests over the "basic principle" of bankruptcy law as discussed earlier in the opinion [referring to its earlier discussion that the goal in bankruptcy is the "prevention of 'grab' tactics that benefit some creditors at the expense of others."]. This Court considers itself bound by that decision of the Supreme Court. To hold this foreclosure to be a preferential transfer would create the same problems with state real property title records that would have been created by classifying the transaction as a fraudulent transfer. Bankruptcy Code § 547 is not more "clear and manifest" to that end than Bankruptcy Code § 548.

*Id.* at 341. While the problems arising from potential preference challenges to foreclosure

sales are the same, the extent of the problem would appear to be less in that preference complaints can only be initiated where the foreclosure occurred within 90 days of a bankruptcy case (versus one year or maybe longer with fraudulent conveyances) and only against creditors, *i.e.*, on account of an antecedent debt (versus third parties as was the case in *BFP*).

14. Indeed in *FIBSA Forwarding, supra*, the bankruptcy court specifically concluded that the foreclosure sale of the debtor's property to the mortgagee allowed it to receive more than it would have received in a Chapter 7 liquidation, thus satisfying the requirement of § 547(b)(5). 230 B.R. at 337–38. Nevertheless, it held that *BFP* was controlling and, therefore, that § 547(b)(5) could not be used to avoid the transfer to the mortgagee as a result of the foreclosure sale as a preference. *Id.* at 338–41. The bankruptcy court declared: "Although it seems very clear, (from the application of simple arithmetic) that the creditor received $7,750 more than the amount to which it was entitled in Chapter 7, judicial precedent and policy appear to mandate the opposite conclusion."

15. At least one commentator has concluded that the Supreme Court's concern for protecting title to foreclosed property led to the strained construction of "received less than a

is axiomatic that a court's duty is to interpret the law not to make it, policy can not be the basis for construing a statute. Since the above cases have not analyzed the applicability of *BFP* as an interpretive tool for construing § 547(b)(5), but rather find its literal application clear, they have limited utility in supporting Chase's position. Unless § 547(b)(5) suffers from the same ambiguity as the Supreme Court found in § 548(a)(2)(A) (now § 548(a)(i)(B)(i)), the policy concerns underpinning *BFP* cannot define preference law even if they are similarly implicated. Rather the inequities of the literal application must be remedied by Congress, not the courts. *Sea–Land Service, Inc. v. Barry*, 41 F.3d 903, 910 (3d Cir.1994).

Recognizing that § 547 presents different statutory language than § 548 (and arguably lesser policy concerns),[16] I thus turn back to *BFP* to discern whether any principles enunciated by the Supreme Court would require this Court to insulate foreclosure sales from avoidance as preferences. In so doing, I find there are certain concepts that are equally applicable.

Section 101(54), as amended in 1984, confirms that a transfer as that term is used in the Bankruptcy Code includes the foreclosure of the debtor's equity of redemption. A common element to both a preference and fraudulent conveyance case is the transfer that occurred when the debtor's ownership interest in real property was sold at foreclosure.

Both §§ 547 and 548 require a arithmetic comparison. The § 548 comparison is described in *BFP* as follows:

> There is no doubt that [§ 548(a)(2)(A)] directs an inquiry into the relationship of the value received by the debtor to the worth of the property transferred. The problem ...is that [the dissent's] highly reformulation of the "plain meaning" of "reasonably equivalent value" continues to leave unanswered the one question central to this case, wherein the ambiguity lies: What is foreclosed property worth? Obviously, until that is determined, we cannot know whether the value received in exchange for a

reasonably equivalent value for such transfer or obligation" embodied in § 548(a)(2)(A)(as amended now codified at § 548(a)(1)(B)(I)). B. Mattingly, The Reestablishment of Bankruptcy Review of Oppressive Foreclosure Sales: the Interaction of Avoidance Powers as Applied to Creditor Bid-Ins, 50 S.C. L.Rev. 363, 400–402 (1999). While there is no doubt that preserving the integrity of regularly conducted foreclosure sales animated the majority decision, its holding is based on its articulated conclusion that the statute was ambiguous in failing to provide a measure of valuation. The policy rationale therefore does not stand alone nor could it as it is not the prerogative of a court to make the law but rather to interpret it. When the language of a statute is plain, the sole function of the courts is to enforce it according to its terms unless the disposition required by the text is absurd. *Hartford Underwriters Insurance Company v. Union Planters Bank*, 530 U.S. 1, 6, 120 S.Ct. 1942, 1947, 147 L.Ed.2d 1

(2000). As the Supreme Court explained in *Barnhart v. Sigmon Coal Company, Inc.*, 534 U.S. 438, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002):

> The first step [in a case of statutory construction] "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340[, 117 S.Ct. 843, 136 L.Ed.2d 808] (1997) (*citing United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240[, 109 S.Ct. 1026, 103 L.Ed.2d 290] (1989)). The inquiry ceases "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" 519 U.S., at 340[, 117 S.Ct. 843][.]

534 U.S. at 450, 122 S.Ct. at 950. Absent a finding that § 547(b)(5) is ambiguous, a court may not refuse to apply it in the name of policy.

**16.** *See* n. 13 *supra*.

foreclosed property is "reasonably equivalent."

*Id.* at 546–47, 114 S.Ct. at 1766. Thus, it would appear that it is not the term "reasonably equivalent value" that was found ambiguous but rather how to value foreclosed property. Only when that question was answered could the arithmetic comparison be made. The Supreme Court answered the question by holding that the value of foreclosed property is conclusively the amount received at a foreclosure sale so long as all the requirements of the state's foreclosure law have been complied with. It unequivocally rejected the use of fair market value as inconsistent with the foreclosure sale process and refused to create a federal reasonable forced-sale price as judicial rule-making. Having so held, the statutory analysis could be readily undertaken. Since the value of the property is the amount paid at the sale which is the same amount as the debtor receives, the debtor receives not merely the reasonably equivalent value but the precise value of the property foreclosed.

The § 547 analysis is different than the analysis under § 548. Framed from the perspective of the creditor, not the debtor, it requires a comparison of what the creditor would receive in a liquidation under Chapter 7, a hypothetical inquiry, with what the creditor actually received.

Where the creditor is oversecured, the creditor's distribution in a Chapter 7 liquidation would be limited to an amount equal to its principal, interest, costs and the value of any prior liens assumed or paid. The question then is what did the creditor actually receive. Clearly, it received the property which must then be valued to complete the exercise. The inquiry is identical to the inquiry that was central to BFP. I paraphrase the Supreme Court. Therein the ambiguity lies: what is the foreclosed property worth? Until that determination is made, I cannot know whether the creditor received more than it would have in a Chapter 7 liquidation.

The Supreme Court has held in the context of a fraudulent conveyance action that the value of foreclosed property is that amount paid at a regularly conducted foreclosure sale. If that is the context in which I must measure the value of the property received by the creditor when the transfer is challenged as a preference, I am bound to hold, as did *BFP*, that such sale cannot be a preferential transfer because the creditor received property of a value equal to the amount of its bid.[17] The fact that the measure in §§ 548 and 547 are different, one requiring "reasonably equivalent value" to the debtor and the other that the creditor receive not more

---

17. Two other cases get to the same result with different reasoning. *In re FIBSA Forwarding, Inc., supra,* the district court reasoned:

> If the price received at a foreclosure is reasonably equivalent to the value of the property sold, then parity of reasoning would suggest that such a foreclosure sale would not have the effect of "enabl[ing] such creditor to receive more than such creditor would receive" a chapter 7. In other words, the creditor received reasonably equivalent value at the foreclosure sale and that is what a creditor could expect in a Chapter 7.

244 B.R. at 96. In *Ehring v. Western Community Moneycenter (In re Ehring),* 900 F.2d 184

(9th Cir.1990), a decision predating *BFP,* the Court concluded that the a foreclosure followed by a sale of the property by the creditor less than four weeks later for 50% more than the bid price would not be avoidable as a preference. It viewed the foreclosing lender to have worn two hats: as buyer and seller and only the former was at issue in evaluating the transfer. It reasoned that if the ultimate buyer had purchased at the sale, there would not have been a preference and the identity of the buyer at a foreclosure sale should not determine whether a preference has occurred. *Id.* at 188–89.

than it would in a liquidation is not dispositive since the Supreme Court's valuation of foreclosed property meets both tests as a matter of law.[18]

Such conclusion is troubling to legal scholars and at least one court which has recognized the potential loss of valuable equity that a trustee could recover for the estate. In *Norwest Bank Minnesota, N.A. v. Andrews*, 262 B.R. 299 (Bankr.M.D.Pa. 2001), the court rejected *BFP* as binding precedent for determining whether a foreclosure sale can be avoided as a preference under § 547(b). There the bankruptcy court reasoned that the plain meaning of the word "more" in § 547(b) supports using a "simple mathematic approach" to determining whether § 547(b)(5) applies to a foreclosure sale, stating

> This simple mathematical approach does not ignore the windfall to creditors of equity that would otherwise be distributed under the liquidation scheme of the bankruptcy code. In bringing the property back into the estate, the creditor's lien is not dissolved nor is its status as a secured creditor destroyed. It remains entitled to adequate protection and all of the privileges and rights provided by the code to secured creditors.

*Id.* at 306. *Andrews* echoed the concern expressed by the *BFP* dissent, 511 U.S. at 563, 114 S.Ct. at 1774, that insulating foreclosure sales from avoidance law would undermine the well-established bankruptcy policies of maximum and equitable distribution for creditors and ensuring a fresh start for debtors. *Andrews*, 262 B.R. at 305. *See also*, Coles–Bjerre, Trusting the Process and Mistrusting the Results: A Structural Perspective on Article 9's Low–Price Foreclosure Rule, 9 Am. Bankr.Inst. L.Rev. 351,355–56 (2001); Mattingly, *supra*, 50 S.C. L.Rev. at 400–01. The preference statute furthers those policies by permitting the avoidance of prebankruptcy transfers by oversecured creditors who have obtained a windfall at the expense of the debtor and/or his other creditors and thereby discouraging such creditors from foreclosing on property in which equity exists when a bankruptcy filing appears imminent or likely to occur. Thus, just as there is a state law policy regarding title to property to be respected, so too are there important bankruptcy policies implicated by extending *BFP* to preference challenges. I do not disagree with the *Andrews* court's view of the equitable and bankruptcy policy implications of using *BFP's* valuation standard when applying preference law. My point of departure is that the court offers no analytical framework to depart from the foreclosure price as the measure of value to be applied.[19] One can be found, however, by focusing on when and in what context the valuation of the property received by the creditor

---

18. I therefore disagree with the commentators who contend that *BFP* has no applicability to preferences because the Supreme Court merely holds that the operative legal standard under § 548, "reasonably equivalent value" was ambiguous. Averch and Berryman, Mortgage Foreclosure as a Preference: Does BFP Protect the Lender?, 7 J. Bankr.L & Prac. 281, 288–89 (1998). The Supreme Court found that term ambiguous to apply because the *standard for valuing foreclosed property was ambiguous*. The issue is whether the valuation standard *BFP* supplied must be utilized in a preference analysis.

19. Interestingly, in framing its holding, the *Andrews* court stated that foreclosure sales can be avoided under § 547(b) when the foreclosing creditor's secured claim is *"substantially* less than the fair market value of the property." *Andrews, supra,* 262 B.R. at 306 (emphasis added). The *Andrews* court did not explain its choice of the word "substantially" nor how that would square with the statutory language that only requires a creditor to receive "more" that it would otherwise be entitled to.

should be made for the purpose of § 547(b)(5).

Under § 548, the Supreme Court has fixed the timing of the valuation at the foreclosure sale, stating that the language of § 548(a)(2)(A) requires "judicial inquiry into whether the foreclosed property was sold for a price that approximated its worth at the time of sale." 511 U.S. at 538–39, 114 S.Ct. at 1762. Because it had to be sold "within the time and manner strictures of state-prescribed foreclosure," only the value received in such a sale is dispositive.

■ The § 547 inquiry is different. Under § 547(b)(5), a court must construct a hypothetical Chapter 7 sale scenario. The presenting question is then whether value for that purpose is fixed when the transfer occurs as in *BFP* or some other date. In *Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 56 S.Ct. 450, 80 L.Ed. 655 (1936),[20] the Supreme Court addressed that question:

> Whether a creditor has received a preference is to be determined, not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results.

*Id.* at 229, 56 S.Ct. at 451. Based on *Palmer Clay* and its progeny, I concluded in another context that the proper time to determine whether a creditor is fully secured for the purposes of conducting the hypothetical liquidation test under § 547(b)(5) is the petition date. *Seitz v. Yudin (In re Cavalier)*, 2002 WL 975868, at *3 (Bankr.E.D.Pa.2002) (citations omitted). Notably *Palmer Clay* involved a

transfer to an unsecured creditor but its reasoning has been adopted and applied to undersecured creditors. *Id.* at n. 10. *But see Telesphere Liquidating Trust v. Galesi (In re Telesphere Communications, Inc.)*, 229 B.R. 173, 178 (Bankr.N.D.Ill.1999) (distinguishing *Palmer Clay* on this ground). At least one commentator believes that the valuation timing rule should be the same with regard to oversecured creditors, *i.e.*, at the petition date so that the secured creditor takes the consequence of appreciation or depreciation of collateral between the time of the challenged transfer and the time of the bankruptcy petition. D. Carlson, Security Interests in the Crucible of Voidable Preference Law, 1995 U. Ill. L.Rev. 211, 265 (1995). If value is to be determined at the time of the bankruptcy petition for the purposes of a preference analysis, it would be counterintuitive to use the foreclosure sale price bid up to ninety days earlier. While it is not possible to predict how the Supreme Court or the Third Circuit Court of Appeals, which has not spoken on this issue, would determine value in the context of a preference challenge to a bid-in by an oversecured creditor at a real estate foreclosure sale, there is enough of a distinction between the § 548(a)(2)(A) analysis as set forth in *BFP* and one required to be undertaken under § 547(b)(5) to refute the notion that *BFP* clearly applies to preference avoidance actions in the manner asserted by the Defendant.

*Cottrell v. United States (In re Cottrell)*, 213 B.R. 33 (M.D.Ala.1997), suggests a pathway out of this statutory thicket. In its view, the price a trustee would secure for the real property in a Chapter 7 case would be the equivalent of the price obtained at a foreclosure sale. In *Cottrell*, a district court affirming the bankruptcy

---

**20.** According to Collier, § 547(b)(5) codifies the holding in *Palmer Clay Products Co. v.* *Brown.* 5 Collier on Bankruptcy ¶ 547.03[7] at 547–44 (15th ed.2002).

court which found *BFP* equally applicable to both §§ 547 and 548, reasoned that the value at foreclosure establishes the forced sale price, "a price which would undoubtedly be duplicated in a forced sale in bankruptcy." *Id.* at 44. Reasoning that the trustee would not try to liquidate such property in a Chapter 7 case, the court concluded that the creditor would ultimately foreclose and the outcome would be the same. The notion that value available for other creditors is lost is thus belied by the reality of bankruptcy practice and residential lending. As recognized by the *Cottrell* court, a Chapter 7 trustee will not administer liened property that she determines will not yield a distribution to creditors but rather will either abandon it or not oppose relief from stay. In determining whether there is value for creditors, the trustee will compare the amount of all liens on the property, the costs of sale, her commissions and the debtor's exemptions to the value she could secure in a quick sale. *See* 11 U.S.C. § 326. Arguably if a debtor has enough equity to resist a sale, he will refinance or sell it rather than lose his equity at a foreclosure. Alternatively, he may file a Chapter 13 petition and seek to cure the arrears over a five year plan. In short, liquidations of residential real property in Chapter 7 are not that common.

■ Nonetheless, to the extent the *Cottrell* court was establishing a per se rule that equates the value a trustee would secure in a liquidation to the price obtained by the creditor at a foreclosure sale,

I respectfully disagree. Clearly there are circumstances where the value a Chapter 7 trustee could secure is greater that the aggregate of all liens, costs of sale and the debtor's exemption, and the trustee would seek to sell the asset to provide a dividend to unsecured creditors. In such instances, the price the trustee could secure would not be the equivalent of the amount bid-in at a foreclosure sale. A *per se* rule would deprive the trustee of the opportunity to recover that value and the unsecured creditors of a dividend. Thus, I would fix value for the purpose of the § 547(b)(5) analysis on what a trustee would receive for such property assuming she would administer the asset for sale.[21] This analytical framework is consistent with *BFP* which stated that property must be valued according to the "time and strictures of its sale." 511 U.S. at 539, 114 S.Ct. at 1762. Under fraudulent conveyance law, the state-prescribed foreclosure sale determines how the property has to be sold. In the preference contest, it is the federal bankruptcy-prescribed sale by a Chapter 7 trustee that is determinative.

The determination of what a trustee would receive in a liquidation of the asset is fact intensive. The trustee could secure fair market value or some lesser value depending on the circumstances presented. The bankruptcy court would make this value judgment based on the evidence presented. In this case, this dispositive issue, *i.e.*, the value of the Residence in the hands of a trustee, has not been proven.[22]

21. This standard would ensure that preference complaints are animated by the purpose of the preference statute, *i.e.*, to recover value for creditors, and not as a vehicle for debtors who have lost their property at a regularly conducted sheriff's sale to obstruct mortgagees from the exercise of their state law remedies by filing bankruptcy and commencing a § 547 action.

22. The Turcella Affidavit states merely that after inspection, she would recommend listing the Residence for $299,000 and that she could secure a buyer at that price. There is no evaluation or basis to support the number she proffers. For example, would the seller have to make any repairs or cosmetic improvements to the residence to secure that price. Importantly, the assumptions made by Turcella in reaching that value are not stated nor is

Ordinarily a disputed fact would negate summary judgment. However, because I am able to conclude on this record that, even accepting the $299,000 value proffered by Debtor, a trustee would not sell the Residence, I am able to resolve this adversary case on this Motion.

 The Chapter 7 trustee's primary role is to liquidate property for the benefit of unsecured creditors and not for the benefit of secured creditors or the debtor. *See, e.g., In re Gallagher*, 283 B.R. 342, 344 (Bankr.M.D.Fla.2002); *In re Tobin*, 202 B.R. 339, 340 (Bankr.D.R.I. 1996); *In re Fournier*, 169 B.R. 282, 284 (Bankr.D.Conn.1994); *Second National Bank of Nazareth v. Marcincin (In re Nadler)*, 8 B.R. 330, 333 (Bankr.E.D.Pa. 1980). Indeed the Chapter 7 trustee is specifically instructed by the United States Trustee to sell only those secured assets that will generate funds for the benefit of unsecured creditors. U.S. Department of Justice Executive Office for United States Trustees, Handbook for Chapter 7 Trustees at 8–20 (2002). Where property is of inconsequential value to the estate, abandonment under § 554, rather than sale under § 363, is the proper course.[23] *In re Feinstein Family Partnership*, 247 B.R. 502, 507 (Bankr.M.D.Fla.2000) ("It is almost universally recognized that where the estate has no equity in a property, abandonment is virtually always appropriate because no unsecured creditor could bene-

fit from the administration."). Moreover, the attempted sale of secured property without the assurance of an equity cushion can be a risky proposition for if the sales proceeds are inadequate to pay the costs of sale, the trustee may not be able to recover them under § 506(c) from a secured creditor who has not consented to the sale. *In re Crutcher Concrete Construction*, 218 B.R. 376, 380 (Bankr. W.D.Ky.1998) (attempt by trustee to sell secured property is deemed unnecessary if trustee does not anticipate sales proceeds will produce some equity for the benefit of the estate.) The decision in *Noland v. Williamson (In re Williamson)*, 94 B.R. 958 (Bankr.S.D.Ohio 1988) is instructive:

> [T]he question here is whether the trustee has unavoidably incurred expenses and costs in connection with the sale of the debtor's interest in real estate. The answer is dependent upon the trustee's adherence to the basic role of a chapter 7 trustee. A chapter 7 trustee is usually regarded as the representative of a debtor's unsecured creditors and is to use the powers granted him by the Bankruptcy Code for the benefit of those creditors. A trustee may sell a debtor's property under 11 U.S.C. § 363, but generally only to benefit the unsecured creditors, *i.e.*, when "the sale proceeds *will fully compensate secured lienholders and produce some equity for the benefit of the bankrupt's estate.*"

---

her experience, if any, selling properties belonging to bankruptcy estates. She does not state whether she could secure a buyer at that price where the seller is a bankruptcy trustee required to dispose of the property consistent with her duty to close the estate "as expeditiously as is compatible with the interests of parties in interest," 11 U.S.C. § 704, may have no disposable funds to prepare the property for sale, and where the sale has to be approved by the bankruptcy court, 11 U.S.C. § 363. Indeed she does not indicate whether she has considered the fact that the property

is part of a bankruptcy estate and whether the very fact it must be sold as such would depress the price.

**23.** In reality, rather than file § 554 motions, most trustees simply do not administer (*i.e.*, seek to sell) such property, leaving the abandonment to occur at the closing of the case, § 554(c), absent a motion by some party in interest to compel abandonment, § 554(b), or a secured creditor for relief from the automatic stay under § 362(d).

*Matter of Riverside Investment Partnership*, 674 F.2d 634, 640 (7th Cir.1982) (emphasis in original). When, after a reasonable period of time for investigating the value of a debtor's property, it appears to the trustee that a sale of a debtor's property will yield no benefit to the estate, it is appropriate for the trustee to abandon the property on the ground that the property "is burdensome to the estate" or "of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a). To attempt to sell estate property after it is apparent that no potential equity exists for the estate is "unnecessary" under Section 506(c).

*Id.* at 962–63.

■ Even with an appraisal in hand of $299,000, a trustee would not seek to administer the Residence as an asset in Chapter 7 as its sale would confer no benefit on creditors of the estate. In reaching this conclusion, I begin by subtracting $238,843.95, the amount of Chase's secured claim.[24] Costs of sale would be offset next. In his Chapter 13 Liquidation Analysis in support of his Chapter 13 Plan, a document of which I take judicial notice, the Debtor estimates that in a liquidation of his real property, costs of 10% would be incurred. Doc. No. 13. In this case, that would equate to $29,900 out of the gross sales proceeds. However, for the purposes of this analysis, I will deduct only the known costs of $20,930 representing real estate commissions of $17,940 and seller's share of the real estate transfer taxes of $2990. Subtracting those conservative amounts from $299,000 yields hypothetical proceeds of $39,226.05. However, before any distribution would reach creditors other than Chase, trustee's commission and professional fees as well as the debtor's exemption would need to be deducted. The trustee's statutory commission is $15,200 based on the formula contained in 11 U.S.C. § 326 and assuming disbursement only to Chase.[25] Since the Residence is owned as tenants by entireties, the trustee would have to sell the Residence pursuant to a § 363(h) motion for which she would incur attorneys' fees.[26]

---

**24.** Lare states the amount due under the mortgage and note as of April 2, 2003 as $242,141.52. Lare Affidavit ¶ 20 and Exhibit K thereto. I have used the above lesser number as Chase does so in its brief, a number I assume represents the amount due as of the petition date. Plaintiffs dispute that number on the erroneous premise that Chase would only be entitled to a 6% rate of interest after judgment was taken and no interest at all after October 23, 2002 when the sale took place. Plaintiffs' Memo at 2. Even had Chase's foreclosure judgment not expressly allowed post-judgment interest at $41.68 per diem, Exhibits F (foreclosure judgment) and H (post-judgement assessment of damages) to Lare Affidavit, Plaintiffs' contention is flawed since the amount due Chase is what it would be entitled to had the foreclosure that it is trying to avoid not occurred. Plaintiffs cannot have it both ways. Moreover, upon sale in Chapter 7, the oversecured creditor is entitled to post-petition interest, attorneys' fees and costs provided by its agreements. 11 U.S.C. § 506(b). Thus, the amount would be increased from the date of the petition to the date of sale by the $41.68 per diem. In short, I have conservatively used the $238,843.95 number as used by Chase but it is understated for the foregoing reasons.

**25.** That sum was calculated as follows: (1) $5000 × 25%; plus (2) $45,000 × 10%; plus (3) $189,000 × 5%.

**26.** The need for such approval to sell both the debtor and non-debtor's interest in the Residence could result in a contested matter that would be a further disincentive to undertaking the disposition absent some perceived material benefit to unsecured creditors. *See Gazes v. Roswick (In re Roswick)*, 231 B.R. 843 (Bankr.S.D.N.Y.1999) (bankruptcy court must consider both economic and noneconomic factors in deciding for purposes of a trustee's motion for authority to sell jointly owned property free and clear of interests of nondebtor cotenant, whether the benefit to estate of authorizing such a sale outweighs detriment to cotenant).

Moreover, if the trustee administers the property, there could be tax consequences for which she would have to retain an accountant, incurring further costs, and perhaps the obligation to pay a capital gain tax. Without regard to a trustee's professional fees for selling the Residence and any tax consequences, at best there would be $24,026.05 in net proceeds to be allocated between Debtor's estate and his spouse. However, the Debtor has claimed an exemption of $17,425.00 in his interest in the Residence pursuant to 11 U.S.C. § 522(d)(1). This sum exceeds the remaining net proceeds attributable to his interest, *i.e.,* $12,013.03. In short, there is no possibility of recovering value for unsecured creditors even using Turella's opinion that she could secure a buyer at $299,000.

Based on the foregoing legal principles and the Chapter 7 trustee's mandate under the U.S. Trustee's Handbook, the inescapable consequence of the foregoing economic analysis is that a trustee would not administer this asset[27] but rather would abandon the Residence to the Debtor or not contest the secured creditor's relief from stay. In such case, Chase would be free to exercise its state law remedies, including foreclosure. Thus, the value of the Residence for the purpose of the § 547(b)(5) analysis would not be the market value the Debtor advances since it would never be realized in a Chapter 7 liquidation scenario. In short, whether I am bound by *BFP's* value determination of foreclosed property or free to value the Residence as it would be sold by a Chapter 7 trustee, the outcome is the same. There is simply no basis to conclude that Chase has received more than it would in a liqui-

dation under Chapter 7 entitling the Plaintiffs to avoid the foreclosure sale.

An Order consistent with the foregoing Opinion shall be entered.

### ORDER

**AND NOW,** this 31st day of July 2003, upon consideration of the motion ("Motion") of Chase Manhattan Mortgage Corporation for summary judgment, and after a hearing with notice, and for the reasons stated in the foregoing Opinion:

It is hereby **ORDERED** and **DECREED** that the Motion is **GRANTED.** Judgment is entered in favor of Defendant Chase Manhattan Mortgage Corporation.

---

**27.** Indeed a trustee could be criticized for doing otherwise since the effect would be to realize a commission for herself without any concomitant benefit to creditors other than

the one secured creditor. *In re Ryan,* 261 B.R. 867, 874 (Bankr.E.D.Va.2001) (sale must be made for the benefit of the estate, not the benefit of the trustee).